# CHURCH OF THE LUKUMI BABALU AYE, INC., ET AL. *v.* CITY OF HIALEAH

No. 91–948.   Argued November 4, 1992—Decided June 11, 1993

522

*Douglas Laycock* argued the cause for petitioners. With him on the briefs were *Jeanne Baker, Steven R. Shapiro,* and *Jorge A. Duarte.*

*Richard G. Garrett* argued the cause for respondent. With him on the brief were *Stuart H. Singer* and *Steven M. Goldsmith.**

JUSTICE KENNEDY delivered the opinion of the Court, except as to Part II–A–2.†

The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions. Cf. *McDaniel* v. *Paty,* 435 U. S. 618 (1978); *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953). Concerned that this fundamental nonpersecution principle of the First Amendment was implicated here, however, we granted certiorari. 503 U. S. 935 (1992).

———

*Briefs of *amici curiae* urging reversal were filed for Americans United for Separation of Church and State et al. by *Edward McGlynn Gaffney, Jr., Steven T. McFarland, Bradley P. Jacob,* and *Michael W. McConnell;* for the Council on Religious Freedom by *Lee Boothby, Robert W. Nixon, Walter E. Carson,* and *Rolland Truman;* and for the Rutherford Institute by *John W. Whitehead.*

Briefs of *amici curiae* urging affirmance were filed for the International Society for Animal Rights et al. by *Henry Mark Holzer;* for People for the Ethical Treatment of Animals et al. by *Gary L. Francione;* and for the Washington Humane Society by *E. Edward Bruce.*

Briefs of *amici curiae* were filed for the United States Catholic Conference by *Mark E. Chopko* and *John A. Liekweg;* for the Humane Society of the United States et al. by *Peter Buscemi, Maureen Beyers, Roger A. Kindler,* and *Eugene Underwood, Jr.;* for the Institute for Animal Rights Law et al. by *Henry Mark Holzer;* and for the National Jewish Commission on Law and Public Affairs by *Nathan Lewin* and *Dennis Rapps.*

†THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join all but Part II–A–2 of this opinion. JUSTICE WHITE joins all but Part II–A of this opinion. JUSTICE SOUTER joins only Parts I, III, and IV of this opinion.

Our review confirms that the laws in question were enacted by officials who did not understand, failed to perceive, or chose to ignore the fact that their official actions violated the Nation's essential commitment to religious freedom. The challenged laws had an impermissible object; and in all events the principle of general applicability was violated because the secular ends asserted in defense of the laws were pursued only with respect to conduct motivated by religious beliefs. We invalidate the challenged enactments and reverse the judgment of the Court of Appeals.

I

A

This case involves practices of the Santeria religion, which originated in the 19th century. When hundreds of thousands of members of the Yoruba people were brought as slaves from western Africa to Cuba, their traditional African religion absorbed significant elements of Roman Catholicism. The resulting syncretion, or fusion, is Santeria, "the way of the saints." The Cuban Yoruba express their devotion to spirits, called *orishas*, through the iconography of Catholic saints, Catholic symbols are often present at Santeria rites, and Santeria devotees attend the Catholic sacraments. 723 F. Supp. 1467, 1469–1470 (SD Fla. 1989); 13 Encyclopedia of Religion 66 (M. Eliade ed. 1987); 1 Encyclopedia of the American Religious Experience 183 (C. Lippy & P. Williams eds. 1988).

The Santeria faith teaches that every individual has a destiny from God, a destiny fulfilled with the aid and energy of the *orishas*. The basis of the Santeria religion is the nurture of a personal relation with the *orishas*, and one of the principal forms of devotion is an animal sacrifice. 13 Encyclopedia of Religion, *supra*, at 66. The sacrifice of animals as part of religious rituals has ancient roots. See generally 12 *id.*, at 554–556. Animal sacrifice is mentioned throughout the Old Testament, see 14 Encyclopaedia Judaica 600, 600–

605 (1971), and it played an important role in the practice of Judaism before destruction of the second Temple in Jerusalem, see *id.*, at 605–612. In modern Islam, there is an annual sacrifice commemorating Abraham's sacrifice of a ram in the stead of his son. See C. Glassé, Concise Encyclopedia of Islam 178 (1989); 7 Encyclopedia of Religion, *supra*, at 456.

According to Santeria teaching, the *orishas* are powerful but not immortal. They depend for survival on the sacrifice. Sacrifices are performed at birth, marriage, and death rites, for the cure of the sick, for the initiation of new members and priests, and during an annual celebration. Animals sacrificed in Santeria rituals include chickens, pigeons, doves, ducks, guinea pigs, goats, sheep, and turtles. The animals are killed by the cutting of the carotid arteries in the neck. The sacrificed animal is cooked and eaten, except after healing and death rituals. See 723 F. Supp., at 1471–1472; 13 Encyclopedia of Religion, *supra*, at 66; M. González-Wippler, The Santería Experience 105 (1982).

Santeria adherents faced widespread persecution in Cuba, so the religion and its rituals were practiced in secret. The open practice of Santeria and its rites remains infrequent. See 723 F. Supp., at 1470; 13 Encyclopedia of Religion, *supra*, at 67; M. González-Wippler, Santería: The Religion 3–4 (1989). The religion was brought to this Nation most often by exiles from the Cuban revolution. The District Court estimated that there are at least 50,000 practitioners in South Florida today. See 723 F. Supp., at 1470.

## B

Petitioner Church of the Lukumi Babalu Aye, Inc. (Church), is a not-for-profit corporation organized under Florida law in 1973. The Church and its congregants practice the Santeria religion. The president of the Church is petitioner Ernesto Pichardo, who is also the Church's priest and holds the religious title of *Italero,* the second highest in the Santeria faith. In April 1987, the Church leased land in

the city of Hialeah, Florida, and announced plans to establish a house of worship as well as a school, cultural center, and museum. Pichardo indicated that the Church's goal was to bring the practice of the Santeria faith, including its ritual of animal sacrifice, into the open. The Church began the process of obtaining utility service and receiving the necessary licensing, inspection, and zoning approvals. Although the Church's efforts at obtaining the necessary licenses and permits were far from smooth, see 723 F. Supp., at 1477–1478, it appears that it received all needed approvals by early August 1987.

The prospect of a Santeria church in their midst was distressing to many members of the Hialeah community, and the announcement of the plans to open a Santeria church in Hialeah prompted the city council to hold an emergency public session on June 9, 1987. The resolutions and ordinances passed at that and later meetings are set forth in the Appendix following this opinion.

A summary suffices here, beginning with the enactments passed at the June 9 meeting. First, the city council adopted Resolution 87–66, which noted the "concern" expressed by residents of the city "that certain religions may propose to engage in practices which are inconsistent with public morals, peace or safety," and declared that "[t]he City reiterates its commitment to a prohibition against any and all acts of any and all religious groups which are inconsistent with public morals, peace or safety." Next, the council approved an emergency ordinance, Ordinance 87–40, which incorporated in full, except as to penalty, Florida's animal cruelty laws. Fla. Stat. ch. 828 (1987). Among other things, the incorporated state law subjected to criminal punishment "[w]hoever . . . unnecessarily or cruelly . . . kills any animal." § 828.12.

The city council desired to undertake further legislative action, but Florida law prohibited a municipality from enacting legislation relating to animal cruelty that conflicted with

state law. § 828.27(4). To obtain clarification, Hialeah's city attorney requested an opinion from the attorney general of Florida as to whether § 828.12 prohibited "a religious group from sacrificing an animal in a religious ritual or practice" and whether the city could enact ordinances "making religious animal sacrifice unlawful." The attorney general responded in mid-July. He concluded that the "ritual sacrifice of animals for purposes other than food consumption" was not a "necessary" killing and so was prohibited by § 828.12. Fla. Op. Atty. Gen. 87–56, Annual Report of the Atty. Gen. 146, 147, 149 (1988). The attorney general appeared to define "unnecessary" as "done without any useful motive, in a spirit of wanton cruelty or for the mere pleasure of destruction without being in any sense beneficial or useful to the person killing the animal." *Id.*, at 149, n. 11. He advised that religious animal sacrifice was against state law, so that a city ordinance prohibiting it would not be in conflict. *Id.*, at 151.

The city council responded at first with a hortatory enactment, Resolution 87–90, that noted its residents' "great concern regarding the possibility of public ritualistic animal sacrifices" and the state-law prohibition. The resolution declared the city policy "to oppose the ritual sacrifices of animals" within Hialeah and announced that any person or organization practicing animal sacrifice "will be prosecuted."

In September 1987, the city council adopted three substantive ordinances addressing the issue of religious animal sacrifice. Ordinance 87–52 defined "sacrifice" as "to unnecessarily kill, torment, torture, or mutilate an animal in a public or private ritual or ceremony not for the primary purpose of food consumption," and prohibited owning or possessing an animal "intending to use such animal for food purposes." It restricted application of this prohibition, however, to any individual or group that "kills, slaughters or sacrifices animals for any type of ritual, regardless of whether or not the flesh or blood of the animal is to be consumed." The ordinance

contained an exemption for slaughtering by "licensed establishment[s]" of animals "specifically raised for food purposes." Declaring, moreover, that the city council "has determined that the sacrificing of animals within the city limits is contrary to the public health, safety, welfare and morals of the community," the city council adopted Ordinance 87–71. That ordinance defined "sacrifice" as had Ordinance 87–52, and then provided that "[i]t shall be unlawful for any person, persons, corporations or associations to sacrifice any animal within the corporate limits of the City of Hialeah, Florida." The final Ordinance, 87–72, defined "slaughter" as "the killing of animals for food" and prohibited slaughter outside of areas zoned for slaughterhouse use. The ordinance provided an exemption, however, for the slaughter or processing for sale of "small numbers of hogs and/or cattle per week in accordance with an exemption provided by state law." All ordinances and resolutions passed the city council by unanimous vote. Violations of each of the four ordinances were punishable by fines not exceeding $500 or imprisonment not exceeding 60 days, or both.

Following enactment of these ordinances, the Church and Pichardo filed this action pursuant to 42 U. S. C. § 1983 in the United States District Court for the Southern District of Florida. Named as defendants were the city of Hialeah and its mayor and members of its city council in their individual capacities. Alleging violations of petitioners' rights under, *inter alia,* the Free Exercise Clause, the complaint sought a declaratory judgment and injunctive and monetary relief. The District Court granted summary judgment to the individual defendants, finding that they had absolute immunity for their legislative acts and that the ordinances and resolutions adopted by the council did not constitute an official policy of harassment, as alleged by petitioners. 688 F. Supp. 1522 (SD Fla. 1988).

After a 9-day bench trial on the remaining claims, the District Court ruled for the city, finding no violation of petition-

ers' rights under the Free Exercise Clause. 723 F. Supp. 1467 (SD Fla. 1989). (The court rejected as well petitioners' other claims, which are not at issue here.) Although acknowledging that "the ordinances are not religiously neutral," *id.*, at 1476, and that the city's concern about animal sacrifice was "prompted" by the establishment of the Church in the city, *id.*, at 1479, the District Court concluded that the purpose of the ordinances was not to exclude the Church from the city but to end the practice of animal sacrifice, for whatever reason practiced, *id.*, at 1479, 1483. The court also found that the ordinances did not target religious conduct "on their face," though it noted that in any event "specifically regulating [religious] conduct" does not violate the First Amendment "when [the conduct] is deemed inconsistent with public health and welfare." *Id.*, at 1483–1484. Thus, the court concluded that, at most, the ordinances' effect on petitioners' religious conduct was "incidental to [their] secular purpose and effect." *Id.*, at 1484.

The District Court proceeded to determine whether the governmental interests underlying the ordinances were compelling and, if so, to balance the "governmental and religious. interests." The court noted that "[t]his 'balance depends upon the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity.'" *Ibid.*, quoting *Grosz* v. *City of Miami Beach,* 721 F. 2d 729, 734 (CA11 1983), cert. denied, 469 U. S. 827 (1984). The court found four compelling interests. First, the court found that animal sacrifices present a substantial health risk, both to participants and the general public. According to the court, animals that are to be sacrificed are often kept in unsanitary conditions and are uninspected, and animal remains are found in public places. 723 F. Supp., at 1474–1475, 1485. Second, the court found emotional injury to children who witness the sacrifice of animals. *Id.*, at 1475–1476, 1485–1486. Third, the court found compelling the city's in-

terest in protecting animals from cruel and unnecessary killing. The court determined that the method of killing used in Santeria sacrifice was "unreliable and not humane, and that the animals, before being sacrificed, are often kept in conditions that produce a great deal of fear and stress in the animal." *Id.*, at 1472–1473, 1486. Fourth, the District Court found compelling the city's interest in restricting the slaughter or sacrifice of animals to areas zoned for slaughterhouse use. *Id.*, at 1486. This legal determination was not accompanied by factual findings.

Balancing the competing governmental and religious interests, the District Court concluded the compelling governmental interests "fully justify the absolute prohibition on ritual sacrifice" accomplished by the ordinances. *Id.*, at 1487. The court also concluded that an exception to the sacrifice prohibition for religious conduct would "'unduly interfere with fulfillment of the governmental interest'" because any more narrow restrictions—*e. g.*, regulation of disposal of animal carcasses—would be unenforceable as a result of the secret nature of the Santeria religion. *Id.*, at 1486–1487, and nn. 57–59. A religious exemption from the city's ordinances, concluded the court, would defeat the city's compelling interests in enforcing the prohibition. *Id.*, at 1487.

The Court of Appeals for the Eleventh Circuit affirmed in a one-paragraph *per curiam* opinion. Judgt. order reported at 936 F. 2d 586 (1991). Choosing not to rely on the District Court's recitation of a compelling interest in promoting the welfare of children, the Court of Appeals stated simply that it concluded the ordinances were consistent with the Constitution. App. to Pet. for Cert. A2. It declined to address the effect of *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990), decided after the District Court's opinion, because the District Court "employed an arguably stricter standard" than that applied in *Smith.* App. to Pet. for Cert. A2, n. 1.

## II

The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, see *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof . . . .*" (Emphasis added.) The city does not argue that Santeria is not a "religion" within the meaning of the First Amendment. Nor could it. Although the practice of animal sacrifice may seem abhorrent to some, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas* v. *Review Bd. of Indiana Employment Security Div.,* 450 U. S. 707, 714 (1981). Given the historical association between animal sacrifice and religious worship, see *supra,* at 524–525, petitioners' assertion that animal sacrifice is an integral part of their religion "cannot be deemed bizarre or incredible." *Frazee* v. *Illinois Dept. of Employment Security,* 489 U. S. 829, 834, n. 2 (1989). Neither the city nor the courts below, moreover, have questioned the sincerity of petitioners' professed desire to conduct animal sacrifices for religious reasons. We must consider petitioners' First Amendment claim.

In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. *Employment Div., Dept. of Human Resources of Ore.* v. *Smith, supra.* Neutrality and general applicability are interrelated, and, as becomes apparent in this case, failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance

that interest. These ordinances fail to satisfy the *Smith* requirements. We begin by discussing neutrality.

### A

In our Establishment Clause cases we have often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general. See, *e. g., Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens,* 496 U. S. 226, 248 (1990) (plurality opinion); *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373, 389 (1985); *Wallace* v. *Jaffree,* 472 U. S. 38, 56 (1985); *Epperson* v. *Arkansas,* 393 U. S. 97, 106–107 (1968); *School Dist. of Abington* v. *Schempp,* 374 U. S. 203, 225 (1963); *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 15–16 (1947). These cases, however, for the most part have addressed governmental efforts to benefit religion or particular religions, and so have dealt with a question different, at least in its formulation and emphasis, from the issue here. Petitioners allege an attempt to disfavor their religion because of the religious ceremonies it commands, and the Free Exercise Clause is dispositive in our analysis.

At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons. See, *e. g., Braunfeld* v. *Brown,* 366 U. S. 599, 607 (1961) (plurality opinion); *Fowler* v. *Rhode Island,* 345 U. S., at 69–70. Indeed, it was "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." *Bowen* v. *Roy,* 476 U. S. 693, 703 (1986) (opinion of Burger, C. J.). See J. Story, Commentaries on the Constitution of the United States §§ 991–992 (abridged ed. 1833) (reprint 1987); T. Cooley, Constitutional Limitations 467 (1868) (reprint 1972); *McGowan* v. *Maryland,* 366 U. S. 420, 464, and n. 2 (1961) (opinion of Frankfurter, J.); *Douglas* v. *Jeannette,* 319 U. S. 157, 179 (1943) (Jackson, J., concurring in re-

sult); *Davis* v. *Beason,* 133 U. S. 333, 342 (1890). These principles, though not often at issue in our Free Exercise Clause cases, have played a role in some. In *McDaniel* v. *Paty,* 435 U. S. 618 (1978), for example, we invalidated a state law that disqualified members of the clergy from holding certain public offices, because it "impose[d] special disabilities on the basis of . . . religious status," *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S., at 877. On the same principle, in *Fowler* v. *Rhode Island, supra,* we found that a municipal ordinance was applied in an unconstitutional manner when interpreted to prohibit preaching in a public park by a Jehovah's Witness but to permit preaching during the course of a Catholic mass or Protestant church service. See also *Niemotko* v. *Maryland,* 340 U. S. 268, 272–273 (1951). Cf. *Larson* v. *Valente,* 456 U. S. 228 (1982) (state statute that treated some religious denominations more favorably than others violated the Establishment Clause).

1

Although a law targeting religious beliefs as such is never permissible, *McDaniel* v. *Paty, supra,* at 626 (plurality opinion); *Cantwell* v. *Connecticut, supra,* at 303–304, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, see *Employment Div., Dept. of Human Resources of Ore.* v. *Smith, supra,* at 878–879; and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest. There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct. To determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context. Petitioners contend that three of the ordinances fail this test of facial neutrality because they use the words

"sacrifice" and "ritual," words with strong religious connotations. Brief for Petitioners 16–17. We agree that these words are consistent with the claim of facial discrimination, but the argument is not conclusive. The words "sacrifice" and "ritual" have a religious origin, but current use admits also of secular meanings. See Webster's Third New International Dictionary 1961, 1996 (1971). See also 12 Encyclopedia of Religion, at 556 ("[T]he word *sacrifice* ultimately became very much a secular term in common usage"). The ordinances, furthermore, define "sacrifice" in secular terms, without referring to religious practices.

We reject the contention advanced by the city, see Brief for Respondent 15, that our inquiry must end with the text of the laws at issue. Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause "forbids subtle departures from neutrality," *Gillette* v. *United States*, 401 U. S. 437, 452 (1971), and "covert suppression of particular religious beliefs," *Bowen* v. *Roy, supra,* at 703 (opinion of Burger, C. J.). Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked as well as overt. "The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Walz* v. *Tax Comm'n of New York City,* 397 U. S. 664, 696 (1970) (Harlan, J., concurring).

The record in this case compels the conclusion that suppression of the central element of the Santeria worship service was the object of the ordinances. First, though use of the words "sacrifice" and "ritual" does not compel a finding of improper targeting of the Santeria religion, the choice of these words is support for our conclusion. There are further respects in which the text of the city council's enactments discloses the improper attempt to target Santeria.

Resolution 87–66, adopted June 9, 1987, recited that "residents and citizens of the City of Hialeah have expressed their concern that certain religions may propose to engage in practices which are inconsistent with public morals, peace or safety," and "reiterate[d]" the city's commitment to prohibit "any and all [such] acts of any and all religious groups." No one suggests, and on this record it cannot be maintained, that city officials had in mind a religion other than Santeria.

It becomes evident that these ordinances target Santeria sacrifice when the ordinances' operation is considered. Apart from the text, the effect of a law in its real operation is strong evidence of its object. To be sure, adverse impact will not always lead to a finding of impermissible targeting. For example, a social harm may have been a legitimate concern of government for reasons quite apart from discrimination. *McGowan* v. *Maryland*, 366 U. S., at 442. See, *e. g.*, *Reynolds* v. *United States*, 98 U. S. 145 (1879); *Davis* v. *Beason*, 133 U. S. 333 (1890). See also Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L. J. 1205, 1319 (1970). The subject at hand does implicate, of course, multiple concerns unrelated to religious animosity, for example, the suffering or mistreatment visited upon the sacrificed animals and health hazards from improper disposal. But the ordinances when considered together disclose an object remote from these legitimate concerns. The design of these laws accomplishes instead a "religious gerrymander," *Walz* v. *Tax Comm'n of New York City, supra,* at 696 (Harlan, J., concurring), an impermissible attempt to target petitioners and their religious practices.

It is a necessary conclusion that almost the only conduct subject to Ordinances 87–40, 87–52, and 87–71 is the religious exercise of Santeria church members. The texts show that they were drafted in tandem to achieve this result. We begin with Ordinance 87–71. It prohibits the sacrifice of animals, but defines sacrifice as "to unnecessarily kill . . . an animal in a public or private ritual or ceremony not for the

primary purpose of food consumption." The definition excludes almost all killings of animals except for religious sacrifice, and the primary purpose requirement narrows the proscribed category even further, in particular by exempting kosher slaughter, see 723 F. Supp., at 1480. We need not discuss whether this differential treatment of two religions is itself an independent constitutional violation. Cf. *Larson* v. *Valente*, 456 U. S., at 244–246. It suffices to recite this feature of the law as support for our conclusion that Santeria alone was the exclusive legislative concern. The net result of the gerrymander is that few if any killings of animals are prohibited other than Santeria sacrifice, which is proscribed because it occurs during a ritual or ceremony and its primary purpose is to make an offering to the *orishas*, not food consumption. Indeed, careful drafting ensured that, although Santeria sacrifice is prohibited, killings that are no more necessary or humane in almost all other circumstances are unpunished.

Operating in similar fashion is Ordinance 87–52, which prohibits the "possess[ion], sacrifice, or slaughter" of an animal with the "inten[t] to use such animal for food purposes." This prohibition, extending to the keeping of an animal as well as the killing itself, applies if the animal is killed in "any type of ritual" and there is an intent to use the animal for food, whether or not it is in fact consumed for food. The ordinance exempts, however, "any licensed [food] establishment" with regard to "any animals which are specifically raised for food purposes," if the activity is permitted by zoning and other laws. This exception, too, seems intended to cover kosher slaughter. Again, the burden of the ordinance, in practical terms, falls on Santeria adherents but almost no others: If the killing is—unlike most Santeria sacrifices—unaccompanied by the intent to use the animal for food, then it is not prohibited by Ordinance 87–52; if the killing is specifically for food but does not occur during the course of "any type of ritual," it again falls outside the prohibition; and if

the killing is for food and occurs during the course of a ritual, it is still exempted if it occurs in a properly zoned and licensed establishment and involves animals "specifically raised for food purposes." A pattern of exemptions parallels the pattern of narrow prohibitions. Each contributes to the gerrymander.

Ordinance 87–40 incorporates the Florida animal cruelty statute, Fla. Stat. § 828.12 (1987). Its prohibition is broad on its face, punishing "[w]hoever . . . unnecessarily . . . kills any animal." The city claims that this ordinance is the epitome of a neutral prohibition. Brief for Respondent 13–14. The problem, however, is the interpretation given to the ordinance by respondent and the Florida attorney general. Killings for religious reasons are deemed unnecessary, whereas most other killings fall outside the prohibition. The city, on what seems to be a *per se* basis, deems hunting, slaughter of animals for food, eradication of insects and pests, and euthanasia as necessary. See *id.*, at 22. There is no indication in the record that respondent has concluded that hunting or fishing for sport is unnecessary. Indeed, one of the few reported Florida cases decided under § 828.12 concludes that the use of live rabbits to train greyhounds is not unnecessary. See *Kiper* v. *State*, 310 So. 2d 42 (Fla. App.), cert. denied, 328 So. 2d 845 (Fla. 1975). Further, because it requires an evaluation of the particular justification for the killing, this ordinance represents a system of "individualized governmental assessment of the reasons for the relevant conduct," *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S., at 884. As we noted in *Smith*, in circumstances in which individualized exemptions from a general requirement are available, the government "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Ibid.*, quoting *Bowen* v. *Roy*, 476 U. S., at 708 (opinion of Burger, C. J.). Respondent's application of the ordinance's test of necessity devalues religious reasons for killing by judging them to be of lesser import than nonre-

ligious reasons. Thus, religious practice is being singled out for discriminatory treatment. *Id.*, at 722, and n. 17 (STEVENS, J., concurring in part and concurring in result); *id.*, at 708 (opinion of Burger, C. J.); *United States* v. *Lee,* 455 U. S. 252, 264, n. 3 (1982) (STEVENS, J., concurring in judgment).

We also find significant evidence of the ordinances' improper targeting of Santeria sacrifice in the fact that they proscribe more religious conduct than is necessary to achieve their stated ends. It is not unreasonable to infer, at least when there are no persuasive indications to the contrary, that a law which visits "gratuitous restrictions" on religious conduct, *McGowan* v. *Maryland,* 366 U. S., at 520 (opinion of Frankfurter, J.), seeks not to effectuate the stated governmental interests, but to suppress the conduct because of its religious motivation.

The legitimate governmental interests in protecting the public health and preventing cruelty to animals could be addressed by restrictions stopping far short of a flat prohibition of all Santeria sacrificial practice.* If improper disposal, not the sacrifice itself, is the harm to be prevented, the city could have imposed a general regulation on the disposal of organic garbage. It did not do so. Indeed, counsel for the city conceded at oral argument that, under the ordinances, Santeria sacrifices would be illegal even if they occurred in licensed, inspected, and zoned slaughterhouses. Tr. of Oral Arg. 45. See also *id.*, at 42, 48. Thus, these broad ordinances prohibit Santeria sacrifice even when it does not threaten the city's

---

*Respondent advances the additional governmental interest in prohibiting the slaughter or sacrifice of animals in areas of the city not zoned for slaughterhouses, see Brief for Respondent 28–31, and the District Court found this interest to be compelling, see 723 F. Supp. 1467, 1486 (SD Fla. 1989). This interest cannot justify Ordinances 87–40, 87–52, and 87–71, for they apply to conduct without regard to where it occurs. Ordinance 87–72 does impose a locational restriction, but this asserted governmental interest is a mere restatement of the prohibition itself, not a justification for it. In our discussion, therefore, we put aside this asserted interest.

interest in the public health. The District Court accepted the argument that narrower regulation would be unenforceable because of the secrecy in the Santeria rituals and the lack of any central religious authority to require compliance with secular disposal regulations. See 723 F. Supp., at 1486–1487, and nn. 58–59. It is difficult to understand, however, how a prohibition of the sacrifices themselves, which occur in private, is enforceable if a ban on improper disposal, which occurs in public, is not. The neutrality of a law is suspect if First Amendment freedoms are curtailed to prevent isolated collateral harms not themselves prohibited by direct regulation. See, e. g., Schneider v. State, 308 U. S. 147, 162 (1939).

Under similar analysis, narrower regulation would achieve the city's interest in preventing cruelty to animals. With regard to the city's interest in ensuring the adequate care of animals, regulation of conditions and treatment, regardless of why an animal is kept, is the logical response to the city's concern, not a prohibition on possession for the purpose of sacrifice. The same is true for the city's interest in prohibiting cruel methods of killing. Under federal and Florida law and Ordinance 87–40, which incorporates Florida law in this regard, killing an animal by the "simultaneous and instantaneous severance of the carotid arteries with a sharp instrument"—the method used in kosher slaughter—is approved as humane. See 7 U. S. C. § 1902(b); Fla. Stat. § 828.23(7)(b) (1991); Ordinance 87–40, § 1. The District Court found that, though Santeria sacrifice also results in severance of the carotid arteries, the method used during sacrifice is less reliable and therefore not humane. See 723 F. Supp., at 1472–1473. If the city has a real concern that other methods are less humane, however, the subject of the regulation should be the method of slaughter itself, not a religious classification that is said to bear some general relation to it.

Ordinance 87–72—unlike the three other ordinances—does appear to apply to substantial nonreligious conduct and

not to be overbroad. For our purposes here, however, the four substantive ordinances may be treated as a group for neutrality purposes. Ordinance 87–72 was passed the same day as Ordinance 87–71 and was enacted, as were the three others, in direct response to the opening of the Church. It would be implausible to suggest that the three other ordinances, but not Ordinance 87–72, had as their object the suppression of religion. We need not decide whether Ordinance 87–72 could survive constitutional scrutiny if it existed separately; it must be invalidated because it functions, with the rest of the enactments in question, to suppress Santeria religious worship.

2

In determining if the object of a law is a neutral one under the Free Exercise Clause, we can also find guidance in our equal protection cases. As Justice Harlan noted in the related context of the Establishment Clause, "[n]eutrality in its application requires an equal protection mode of analysis." *Walz* v. *Tax Comm'n of New York City*, 397 U. S., at 696 (concurring opinion). Here, as in equal protection cases, we may determine the city council's object from both direct and circumstantial evidence. *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 266 (1977). Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body. *Id.*, at 267–268. These objective factors bear on the question of discriminatory object. *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 279, n. 24 (1979).

That the ordinances were enacted "'because of,' not merely 'in spite of,'" their suppression of Santeria religious practice, *id.*, at 279, is revealed by the events preceding their enactment. Although respondent claimed at oral argument

that it had experienced significant problems resulting from the sacrifice of animals within the city before the announced opening of the Church, Tr. of Oral Arg. 27, 46, the city council made no attempt to address the supposed problem before its meeting in June 1987, just weeks after the Church announced plans to open. The minutes and taped excerpts of the June 9 session, both of which are in the record, evidence significant hostility exhibited by residents, members of the city council, and other city officials toward the Santeria religion and its practice of animal sacrifice. The public crowd that attended the June 9 meetings interrupted statements by council members critical of Santeria with cheers and the brief comments of Pichardo with taunts. When Councilman Martinez, a supporter of the ordinances, stated that in pre-revolution Cuba "people were put in jail for practicing this religion," the audience applauded. Taped excerpts of Hialeah City Council Meeting, June 9, 1987.

Other statements by members of the city council were in a similar vein. For example, Councilman Martinez, after noting his belief that Santeria was outlawed in Cuba, questioned: "[I]f we could not practice this [religion] in our homeland [Cuba], why bring it to this country?" Councilman Cardoso said that Santeria devotees at the Church "are in violation of everything this country stands for." Councilman Mejides indicated that he was "totally against the sacrificing of animals" and distinguished kosher slaughter because it had a "real purpose." The "Bible says we are allowed to sacrifice an animal for consumption," he continued, "but for any other purposes, I don't believe that the Bible allows that." The president of the city council, Councilman Echevarria, asked: "What can we do to prevent the Church from opening?"

Various Hialeah city officials made comparable comments. The chaplain of the Hialeah Police Department told the city council that Santeria was a sin, "foolishness," "an abomination to the Lord," and the worship of "demons." He advised

the city council: "We need to be helping people and sharing with them the truth that is found in Jesus Christ." He concluded: "I would exhort you . . . not to permit this Church to exist." The city attorney commented that Resolution 87–66 indicated: "This community will not tolerate religious practices which are abhorrent to its citizens . . . ." *Ibid.* Similar comments were made by the deputy city attorney. This history discloses the object of the ordinances to target animal sacrifice by Santeria worshippers because of its religious motivation.

### 3

In sum, the neutrality inquiry leads to one conclusion: The ordinances had as their object the suppression of religion. The pattern we have recited discloses animosity to Santeria adherents and their religious practices; the ordinances by their own terms target this religious exercise; the texts of the ordinances were gerrymandered with care to proscribe religious killings of animals but to exclude almost all secular killings; and the ordinances suppress much more religious conduct than is necessary in order to achieve the legitimate ends asserted in their defense. These ordinances are not neutral, and the court below committed clear error in failing to reach this conclusion.

### B

We turn next to a second requirement of the Free Exercise Clause, the rule that laws burdening religious practice must be of general applicability. *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S., at 879–881. All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause "protect[s] religious observers against unequal treatment," *Hobbie* v. *Unemployment Appeals Comm'n of Fla.,* 480 U. S. 136, 148 (1987) (STEVENS, J., concurring in judgment), and inequality results when a legislature decides that

the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation.

The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause. The principle underlying the general applicability requirement has parallels in our First Amendment jurisprudence. See, e. g., Cohen v. Cowles Media Co., 501 U. S. 663, 669–670 (1991); University of Pennsylvania v. EEOC, 493 U. S. 182, 201 (1990); Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue, 460 U. S. 575, 585 (1983); Larson v. Valente, 456 U. S., at 245–246; Presbyterian Church in U. S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U. S. 440, 449 (1969). In this case we need not define with precision the standard used to evaluate whether a prohibition is of general application, for these ordinances fall well below the minimum standard necessary to protect First Amendment rights.

Respondent claims that Ordinances 87–40, 87–52, and 87–71 advance two interests: protecting the public health and preventing cruelty to animals. The ordinances are underinclusive for those ends. They fail to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than Santeria sacrifice does. The underinclusion is substantial, not inconsequential. Despite the city's proffered interest in preventing cruelty to animals, the ordinances are drafted with care to forbid few killings but those occasioned by religious sacrifice. Many types of animal deaths or kills for nonreligious reasons are either not prohibited or approved by express provision. For example, fishing—which occurs in Hialeah, see A. Khedouri & F. Khedouri, South Florida Inside Out 57 (1991)—is legal. Extermination of mice and rats within a home is also permitted. Florida law incorporated by Ordinance 87–40 sanctions

euthanasia of "stray, neglected, abandoned, or unwanted animals," Fla. Stat. § 828.058 (1987); destruction of animals judicially removed from their owners "for humanitarian reasons" or when the animal "is of no commercial value," § 828.073(4)(c)(2); the infliction of pain or suffering "in the interest of medical science," § 828.02; the placing of poison in one's yard or enclosure, § 828.08; and the use of a live animal "to pursue or take wildlife or to participate in any hunting," § 828.122(6)(b), and "to hunt wild hogs," § 828.122(6)(e).

The city concedes that "neither the State of Florida nor the City has enacted a generally applicable ban on the killing of animals." Brief for Respondent 21. It asserts, however, that animal sacrifice is "different" from the animal killings that are permitted by law. *Ibid.* According to the city, it is "self-evident" that killing animals for food is "important"; the eradication of insects and pests is "obviously justified"; and the euthanasia of excess animals "makes sense." *Id.*, at 22. These *ipse dixits* do not explain why religion alone must bear the burden of the ordinances, when many of these secular killings fall within the city's interest in preventing the cruel treatment of animals.

The ordinances are also underinclusive with regard to the city's interest in public health, which is threatened by the disposal of animal carcasses in open public places and the consumption of uninspected meat, see Brief for Respondent 32, citing 723 F. Supp., at 1474–1475, 1485. Neither interest is pursued by respondent with regard to conduct that is not motivated by religious conviction. The health risks posed by the improper disposal of animal carcasses are the same whether Santeria sacrifice or some nonreligious killing preceded it. The city does not, however, prohibit hunters from bringing their kill to their houses, nor does it regulate disposal after their activity. Despite substantial testimony at trial that the same public health hazards result from improper disposal of garbage by restaurants, see 11 Record 566,

590–591, restaurants are outside the scope of the ordinances. Improper disposal is a general problem that causes substantial health risks, 723 F. Supp., at 1485, but which respondent addresses only when it results from religious exercise.

The ordinances are underinclusive as well with regard to the health risk posed by consumption of uninspected meat. Under the city's ordinances, hunters may eat their kill and fishermen may eat their catch without undergoing governmental inspection. Likewise, state law requires inspection of meat that is sold but exempts meat from animals raised for the use of the owner and "members of his household and nonpaying guests and employees." Fla. Stat. § 585.88(1)(a) (1991). The asserted interest in inspected meat is not pursued in contexts similar to that of religious animal sacrifice.

Ordinance 87–72, which prohibits the slaughter of animals outside of areas zoned for slaughterhouses, is underinclusive on its face. The ordinance includes an exemption for "any person, group, or organization" that "slaughters or processes for sale, small numbers of hogs and/or cattle per week in accordance with an exemption provided by state law." See Fla. Stat. § 828.24(3) (1991). Respondent has not explained why commercial operations that slaughter "small numbers" of hogs and cattle do not implicate its professed desire to prevent cruelty to animals and preserve the public health. Although the city has classified Santeria sacrifice as slaughter, subjecting it to this ordinance, it does not regulate other killings for food in like manner.

We conclude, in sum, that each of Hialeah's ordinances pursues the city's governmental interests only against conduct motivated by religious belief. The ordinances "ha[ve] every appearance of a prohibition that society is prepared to impose upon [Santeria worshippers] but not upon itself." *Florida Star* v. *B. J. F.*, 491 U. S. 524, 542 (1989) (SCALIA, J., concurring in part and concurring in judgment). This

precise evil is what the requirement of general applicability is designed to prevent.

### III

A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance " 'interests of the highest order' " and must be narrowly tailored in pursuit of those interests. *McDaniel* v. *Paty*, 435 U. S., at 628, quoting *Wisconsin* v. *Yoder*, 406 U. S. 205, 215 (1972). The compelling interest standard that we apply once a law fails to meet the *Smith* requirements is not "water[ed] . . . down" but "really means what it says." *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S., at 888. A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases. It follows from what we have already said that these ordinances cannot withstand this scrutiny.

First, even were the governmental interests compelling, the ordinances are not drawn in narrow terms to accomplish those interests. As we have discussed, see *supra*, at 538–540, 543–546, all four ordinances are overbroad or under-inclusive in substantial respects. The proffered objectives are not pursued with respect to analogous nonreligious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree. The absence of narrow tailoring suffices to establish the invalidity of the ordinances. See *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 232 (1987).

Respondent has not demonstrated, moreover, that, in the context of these ordinances, its governmental interests are compelling. Where government restricts only conduct protected by the First Amendment and fails to enact feasible

measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling. It is established in our strict scrutiny jurisprudence that "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Florida Star* v. *B. J. F., supra,* at 541–542 (SCALIA, J., concurring in part and concurring in judgment) (citation omitted). See *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105, 119–120 (1991). Cf. *Florida Star* v. *B. J. F., supra,* at 540–541; *Smith* v. *Daily Mail Publishing Co.,* 443 U. S. 97, 104–105 (1979); *id.,* at 110 (REHNQUIST, J., concurring in judgment). As we show above, see *supra,* at 543–546, the ordinances are underinclusive to a substantial extent with respect to each of the interests that respondent has asserted, and it is only conduct motivated by religious conviction that bears the weight of the governmental restrictions. There can be no serious claim that those interests justify the ordinances.

## IV

The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures. Those in office must be resolute in resisting importunate demands and must ensure that the sole reasons for imposing the burdens of law and regulation are secular. Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices. The laws here in question were enacted contrary to these constitutional principles, and they are void.

*Reversed.*

## APPENDIX TO OPINION OF THE COURT

City of Hialeah, Florida, Resolution No. 87–66, adopted June 9, 1987, provides:

"WHEREAS, residents and citizens of the City of Hialeah have expressed their concern that certain religions may propose to engage in practices which are inconsistent with public morals, peace or safety, and

"WHEREAS, the Florida Constitution, Article I, Declaration of Rights, Section 3, Religious Freedom, specifically states that religious freedom shall not justify practices inconsistent with public morals, peace or safety.

"NOW, THEREFORE, BE IT RESOLVED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF HIALEAH, FLORIDA, that:

"1. The City reiterates its commitment to a prohibition against any and all acts of any and all religious groups which are inconsistent with public morals, peace or safety."

City of Hialeah, Florida, Ordinance No. 87–40, adopted June 9, 1987, provides:

"WHEREAS, the citizens of the City of Hialeah, Florida, have expressed great concern over the potential for animal sacrifices being conducted in the City of Hialeah; and

"WHEREAS, Section 828.27, Florida Statutes, provides that 'nothing contained in this section shall prevent any county or municipality from enacting any ordinance relating to animal control or cruelty to animals which is identical to the provisions of this Chapter . . . except as to penalty.'

"NOW, THEREFORE, BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF HIALEAH, FLORIDA, that:

"*Section 1.* The Mayor and City Council of the City of Hialeah, Florida, hereby adopt Florida Statute, Chapter 828—'Cruelty to Animals' (copy attached hereto and made a part hereof), in its entirety (relating to animal control or cruelty to animals), except as to penalty.

"*Section 2.* Repeal of Ordinances in Conflict.

"All ordinances or parts of ordinances in conflict herewith are hereby repealed to the extent of such conflict.

"*Section 3.* Penalties.

"Any person, firm or corporation convicted of violating the provisions of this ordinance shall be punished by a fine, not exceeding $500.00, or by a jail sentence, not exceeding sixty (60) days, or both, in the discretion of the Court.

"*Section 4.* Inclusion in Code.

"The provisions of this Ordinance shall be included and incorporated in the Code of the City of Hialeah, as an addition or amendment thereto, and the sections of this Ordinance shall be re-numbered to conform to the uniform numbering system of the Code.

"*Section 5.* Severability Clause.

"If any phrase, clause, sentence, paragraph or section of this Ordinance shall be declared invalid or unconstitutional by the judge or decree of a court of competent jurisdiction, such invalidity or unconstitutionality shall not effect any of the remaining phrases, clauses, sentences, paragraphs or sections of this ordinance.

"*Section 6.* Effective Date.

"This Ordinance shall become effective when passed by the City Council of the City of Hialeah and signed by the Mayor of the City of Hialeah."

City of Hialeah Resolution No. 87–90, adopted August 11, 1987, provides:

"WHEREAS, the residents and citizens of the City of Hialeah, Florida, have expressed great concern regard-

ing the possibility of public ritualistic animal sacrifices in the City of Hialeah, Florida; and

"WHEREAS, the City of Hialeah, Florida, has received an opinion from the Attorney General of the State of Florida, concluding that public ritualistic animal sacrifices is *[sic]* a violation of the Florida State Statute on Cruelty to Animals; and

"WHEREAS, the Attorney General further held that the sacrificial killing of animals other than for the primary purpose of food consumption is prohibited under state law; and

"WHEREAS, the City of Hialeah, Florida, has enacted an ordinance mirroring state law prohibiting cruelty to animals.

"NOW, THEREFORE, BE IT RESOLVED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF HIALEAH, FLORIDA, that:

"*Section 1.* It is the policy of the Mayor and City Council of the City of Hialeah, Florida, to oppose the ritual sacrifices of animals within the City of Hialeah, FLorida *[sic]*. Any individual or organization that seeks to practice animal sacrifice in violation of state and local law will be prosecuted."

City of Hialeah, Florida, Ordinance No. 87–52, adopted September 8, 1987, provides:

"WHEREAS, the residents and citizens of the City of Hialeah, Florida, have expressed great concern regarding the possibility of public ritualistic animal sacrifices within the City of Hialeah, Florida; and

"WHEREAS, the City of Hialeah, Florida, has received an opinion from the Attorney General of the State of Florida, concluding that public ritualistic animal sacrifice, other than for the primary purpose of food consumption, is a violation of state law; and

"WHEREAS, the City of Hialeah, Florida, has enacted an ordinance (Ordinance No. 87-40), mirroring the state law prohibiting cruelty to animals.

"WHEREAS, the City of Hialeah, Florida, now wishes to specifically prohibit the possession of animals for slaughter or sacrifice within the City of Hialeah, Florida.

"NOW, THEREFORE, BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF HIALEAH, FLORIDA, that:

"*Section 1.* Chapter 6 of the Code of Ordinances of the City of Hialeah, Florida, is hereby amended by adding thereto two (2) new Sections 6-8 'Definitions' and 6-9 'Prohibition Against Possession Of Animals For Slaughter Or Sacrifice', which is to read as follows:

"Section 6-8. Definitions

"1. Animal—any living dumb creature.

"2. Sacrifice—to unnecessarily kill, torment, torture, or mutilate an animal in a public or private ritual or ceremony not for the primary purpose of food consumption.

"3. Slaughter—the killing of animals for food.

"Section 6-9. Prohibition Against Possession of Animals for Slaughter Or Sacrifice.

"1. No person shall own, keep or otherwise possess, sacrifice, or slaughter any sheep, goat, pig, cow or the young of such species, poultry, rabbit, dog, cat, or any other animal, intending to use such animal for food purposes.

"2. This section is applicable to any group or individual that kills, slaughters or sacrifices animals for any type of ritual, regardless of whether or not the flesh or blood of the animal is to be consumed.

"3. Nothing in this ordinance is to be interpreted as prohibiting any licensed establishment from slaughtering for food purposes any animals which are specifically

**552**

raised for food purposes where such activity is properly zoned and/or permitted under state and local law and under rules promulgated by the Florida Department of Agriculture.

"*Section 2.* Repeal of Ordinance in Conflict.

"All ordinances or parts of ordinances in conflict herewith are hereby repealed to the extent of such conflict.

"*Section 3.* Penalties.

"Any person, firm or corporation convicted of violating the provisions of this ordinance shall be punished by a fine, not exceeding $500.00, or by a jail sentence, not exceeding sixty (60) days, or both, in the discretion of the Court.

"*Section 4.* Inclusion in Code.

"The provisions of this Ordinance shall be included and incorporated in the Code of the City of Hialeah, as an addition or amendment thereto, and the sections of this Ordinance shall be re-numbered to conform to the uniform numbering system of the Code.

"*Section 5.* Severability Clause.

"If any phrase, clause, sentence, paragraph or section of this Ordinance shall be declared invalid or unconstitutional by the judgement or decree of a court of competent jurisdiction, such invalidity or unconstitutionality shall not effect any of the remaining phrases, clauses, sentences, paragraphs or sections of this ordinance.

"*Section 6.* Effective Date.

"This Ordinance shall become effective when passed by the City Council of the City of Hialeah and signed by the Mayor of the City of Hialeah."

City of Hialeah, Florida, Ordinance No. 87–71, adopted September 22, 1987, provides:

"WHEREAS, the City Council of the City of Hialeah, Florida, has determined that the sacrificing of animals

within the city limits is contrary to the public health, safety, welfare and morals of the community; and

"WHEREAS, the City Council of the City of Hialeah, Florida, desires to have qualified societies or corporations organized under the laws of the State of Florida, to be authorized to investigate and prosecute any violation(s) of the ordinance herein after set forth, and for the registration of the agents of said societies.

"NOW, THEREFORE, BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF HIALEAH, FLORIDA, that:

"*Section 1.* For the purpose of this ordinance, the word sacrifice shall mean: to unnecessarily kill, torment, torture, or mutilate an animal in a public or private ritual or ceremony not for the primary purpose of food consumption.

"*Section 2.* For the purpose of this ordinance, the word animal shall mean: any living dumb creature.

"*Section 3.* It shall be unlawful for any person, persons, corporations or associations to sacrifice any animal within the corporate limits of the City of Hialeah, Florida.

"*Section 4.* All societies or associations for the prevention of cruelty to animals organized under the laws of the State of Florida, seeking to register with the City of Hialeah for purposes of investigating and assisting in the prosecution of violations and provisions *[sic]* of this Ordinance, shall apply to the City Council for authorization to so register and shall be registered with the Office of the Mayor of the City of Hialeah, Florida, following approval by the City Council at a public hearing in accordance with rules and regulations (i. e., criteria) established by the City Council by resolution, and shall thereafter, be empowered to assist in the prosection of any violation of this Ordinance.

"*Section 5.* Any society or association for the prevention of cruelty to animals registered with the Mayor of the City of Hialeah, Florida, in accordance with the provisions of Section 4 hereinabove, may appoint agents for the purposes of investigating and assisting in the prosecution of violations and provisions *[sic]* of this Ordinance, or any other laws of the City of Hialeah, Florida, for the purpose of protecting animals and preventing any act prohibited hereunder.

"*Section 6.* Repeal of Ordinances in Conflict.

"All ordinances or parts of ordinances in conflict herewith are hereby repealed to the extent of such conflict.

"*Section 7.* Penalties.

"Any person, firm or corporation convicted of violating the provisions of this ordinance shall be punished by a fine, not exceeding $500.00, or by a jail sentence, not exceeding sixty (60) days, or both, in the discretion of the Court.

"*Section 8.* Inclusion in Code.

"The provisions of this Ordinance shall be included and incorporated in the Code of the City of Hialeah, as an addition or amendment thereto, and the sections of this Ordinance shall be re-numbered to conform to the uniform numbering system of the Code.

"*Section 9.* Severability Clause.

"If any phrase, clause, sentence, paragraph or section of this Ordinance shall be declared invalid or unconstitutional by the judgment or decree of a court of competent jurisdiction, such invalidity or unconstitutionality shall not effect any of the remaining phrases, clauses, sentences, paragraphs or sections of this Ordinance.

"*Section 10.* Effective Date.

"This Ordinance shall become effective when passed by the City Council of the City of Hialeah and signed by the Mayor of the City of Hialeah."

City of Hialeah, Florida, Ordinance No. 87–72, adopted September 22, 1987, provides:

"WHEREAS, the City Council of the City of Hialeah, Florida, has determined that the slaughtering of animals on the premises other than those properly zoned as a slaughter house, is contrary to the public health, safety and welfare of the citizens of Hialeah, Florida.

"NOW, THEREFORE, BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF HIALEAH, FLORIDA, that:

"*Section 1.* For the purpose of this Ordinance, the word slaughter shall mean: the killing of animals for food.

"*Section 2.* For the purpose of this Ordinance, the word animal shall mean: any living dumb creature.

"*Section 3.* It shall be unlawful for any person, persons, corporations or associations to slaughter any animal on any premises in the City of Hialeah, Florida, except those properly zoned as a slaughter house, and meeting all the health, safety and sanitation codes prescribed by the City for the operation of a slaughter house.

"*Section 4.* All societies or associations for the prevention of cruelty to animals organized under the laws of the State of Florida, seeking to register with the City of Hialeah for purposes of investigating and assisting in the prosecution of violations and provisions [sic] of this Ordinance, shall apply to the City Council for authorization to so register and shall be registered with the Office of the Mayor of the City of Hialeah, Florida, following approval by the City Council at a public hearing in accordance with rules and regulations (i. e., criteria) established by the City Council by resolution, and shall thereafter, be empowered to assist in the prosection of any violations of this Ordinance.

"*Section 5.*    Any society or association for the prevention of cruelty to animals registered with the Mayor of the City of Hialeah, Florida, in accordance with the provisions of Section 4 hereinabove, may appoint agents for the purposes of investigating and assisting in the prosecution of violations and provisions *[sic]* of this Ordinance, or any other laws of the City of Hialeah, Florida, for the purpose of protecting animals and preventing any act prohibited hereunder.

"*Section 6.*    This Ordinance shall not apply to any person, group, or organization that slaughters, or processes for sale, small numbers of hogs and/or cattle per week in accordance with an exemption provided by state law.

"*Section 7.*    Repeal of Ordinances in Conflict.

"All ordinances or parts of ordinances in conflict herewith are hereby repealed to the extent of such conflict.

"*Section 8.*    Penalties.

"Any person, firm or corporation convicted of violating the provisions of this ordinance shall be punished by a fine, not exceeding $500.00, or by a jail sentence, not exceeding sixty (60) days, or both, in the discretion of the Court.

"*Section 9.*    Inclusion in Code.

"The provisions of this Ordinance shall be included and incorporated in the Code of the City of Hialeah, as an addition or amendment thereto, and the sections of this Ordinance shall be re-numbered to conform to the uniform numbering system of the Code.

"*Section 10.*    Severability Clause.

"If any phrase, clause, sentence, paragraph or section of this Ordinance shall be declared invalid or unconstitutional by the judgment or decree of a court of competent jurisdiction, such invalidity or unconstitutionality shall not effect any of the remaining phrases, clauses, sentences, paragraphs or sections of this ordinance.

"*Section 11.*  Effective Date.

"This Ordinance shall become effective when passed by the City Council of the City of Hialeah and signed by the Mayor of the City of Hialeah."

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins, concurring in part and concurring in the judgment.

The Court analyzes the "neutrality" and the "general applicability" of the Hialeah ordinances in separate sections (Parts II–A and II–B, respectively), and allocates various invalidating factors to one or the other of those sections.  If it were necessary to make a clear distinction between the two terms, I would draw a line somewhat different from the Court's.  But I think it is not necessary, and would frankly acknowledge that the terms are not only "interrelated," *ante,* at 531, but substantially overlap.

The terms "neutrality" and "general applicability" are not to be found within the First Amendment itself, of course, but are used in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990), and earlier cases to describe those characteristics which cause a law that prohibits an activity a particular individual wishes to engage in for religious reasons nonetheless not to constitute a "law . . . prohibiting the free exercise" of religion within the meaning of the First Amendment.  In my view, the defect of lack of neutrality applies primarily to those laws that *by their terms* impose disabilities on the basis of religion (*e. g.,* a law excluding members of a certain sect from public benefits, cf. *Mc-Daniel* v. *Paty,* 435 U. S. 618 (1978)), see *Bowen* v. *Roy,* 476 U. S. 693, 703–704 (1986) (opinion of Burger, C. J.); whereas the defect of lack of general applicability applies primarily to those laws which, though neutral in their terms, through their design, construction, or enforcement target the practices of a particular religion for discriminatory treatment, see *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953).  But certainly a law that is not of general applicability (in the sense

I have described) can be considered "nonneutral"; and certainly no law that is nonneutral (in the relevant sense) can be thought to be of general applicability. Because I agree with most of the invalidating factors set forth in Part II of the Court's opinion, and because it seems to me a matter of no consequence under which rubric ("neutrality," Part II–A, or "general applicability," Part II–B) each invalidating factor is discussed, I join the judgment of the Court and all of its opinion except section 2 of Part II–A.

I do not join that section because it departs from the opinion's general focus on the object of the *laws* at issue to consider the subjective motivation of the *lawmakers, i. e.,* whether the Hialeah City Council actually *intended* to disfavor the religion of Santeria. As I have noted elsewhere, it is virtually impossible to determine the singular "motive" of a collective legislative body, see, *e. g., Edwards* v. *Aguillard,* 482 U. S. 578, 636–639 (1987) (dissenting opinion), and this Court has a long tradition of refraining from such inquiries, see, *e. g., Fletcher* v. *Peck,* 6 Cranch 87, 130–131 (1810) (Marshall, C. J.); *United States* v. *O'Brien,* 391 U. S. 367, 383–384 (1968).

Perhaps there are contexts in which determination of legislative motive *must* be undertaken. See, *e. g., United States* v. *Lovett,* 328 U. S. 303 (1946). But I do not think that is true of analysis under the First Amendment (or the Fourteenth, to the extent it incorporates the First). See *Edwards* v. *Aguillard, supra,* at 639 (SCALIA, J., dissenting). The First Amendment does not refer to the purposes for which legislators enact laws, but to the effects of the laws enacted: "Congress shall make no law . . . prohibiting the free exercise [of religion] . . . ." This does not put us in the business of invalidating laws by reason of the evil motives of their authors. Had the Hialeah City Council set out resolutely to suppress the practices of Santeria, but ineptly adopted ordinances that failed to do so, I do not see how those laws could be said to "prohibi[t] the free exercise" of

religion. Nor, in my view, does it matter that a legislature consists entirely of the purehearted, if the law it enacts in fact singles out a religious practice for special burdens. Had the ordinances here been passed with no motive on the part of any councilman except the ardent desire to prevent cruelty to animals (as might in fact have been the case), they would nonetheless be invalid.

JUSTICE SOUTER, concurring in part and concurring in the judgment.

This case turns on a principle about which there is no disagreement, that the Free Exercise Clause bars government action aimed at suppressing religious belief or practice. The Court holds that Hialeah's animal-sacrifice laws violate that principle, and I concur in that holding without reservation.

Because prohibiting religious exercise is the object of the laws at hand, this case does not present the more difficult issue addressed in our last free-exercise case, *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990), which announced the rule that a "neutral, generally applicable" law does not run afoul of the Free Exercise Clause even when it prohibits religious exercise in effect. The Court today refers to that rule in dicta, and despite my general agreement with the Court's opinion I do not join Part II, where the dicta appear, for I have doubts about whether the *Smith* rule merits adherence. I write separately to explain why the *Smith* rule is not germane to this case and to express my view that, in a case presenting the issue, the Court should reexamine the rule *Smith* declared.

I

According to *Smith,* if prohibiting the exercise of religion results from enforcing a "neutral, generally applicable" law, the Free Exercise Clause has not been offended. *Id.,* at 878–880. I call this the *Smith* rule to distinguish it from the noncontroversial principle, also expressed in *Smith* though

established long before, that the Free Exercise Clause is offended when prohibiting religious exercise results from a law that is not neutral or generally applicable. It is this noncontroversial principle, that the Free Exercise Clause requires neutrality and general applicability, that is at issue here. But before turning to the relationship of *Smith* to this case, it will help to get the terms in order, for the significance of the *Smith* rule is not only in its statement that the Free Exercise Clause requires no more than "neutrality" and "general applicability," but also in its adoption of a particular, narrow conception of free-exercise neutrality.

That the Free Exercise Clause contains a "requirement for governmental neutrality," *Wisconsin* v. *Yoder*, 406 U. S. 205, 220 (1972), is hardly a novel proposition; though the term does not appear in the First Amendment, our cases have used it as shorthand to describe, at least in part, what the Clause commands. See, *e. g., Jimmy Swaggart Ministries* v. *Board of Equalization of Cal.*, 493 U. S. 378, 384 (1990); *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707, 717 (1981); *Yoder, supra,* at 220; *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 792–793 (1973); *School Dist. of Abington* v. *Schempp*, 374 U. S. 203, 222 (1963); see also *McDaniel* v. *Paty*, 435 U. S. 618, 627–629 (1978) (plurality opinion) (invalidating a nonneutral law without using the term). Nor is there anything unusual about the notion that the Free Exercise Clause requires general applicability, though the Court, until today, has not used exactly that term in stating a reason for invalidation. See *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953); cf. *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 585 (1983); *Larson* v. *Valente*, 456 U. S. 228, 245–246 (1982).[1]

---

[1] A law that is not generally applicable according to the Court's definition (one that "selective[ly] impose[s] burdens only on conduct motivated by religious belief," *ante,* at 543) would, it seems to me, fail almost any test for neutrality. Accordingly, the cases stating that the Free Exercise

While general applicability is, for the most part, self-explanatory, free-exercise neutrality is not self-revealing. Cf. *Lee* v. *Weisman*, 505 U. S. 577, 627 (1992) (SOUTER, J., concurring) (considering Establishment Clause neutrality). A law that is religion neutral on its face or in its purpose may lack neutrality in its effect by forbidding something that religion requires or requiring something that religion forbids. Cf. McConnell & Posner, An Economic Approach to Issues of Religious Freedom, 56 U. Chi. L. Rev. 1, 35 (1989) ("[A] regulation is not neutral in an economic sense if, whatever its normal scope or its intentions, it arbitrarily imposes greater costs on religious than on comparable nonreligious activities"). A secular law, applicable to all, that prohibits consumption of alcohol, for example, will affect members of religions that require the use of wine differently from members of other religions and nonbelievers, disproportionately burdening the practice of, say, Catholicism or Judaism. Without an exemption for sacramental wine, Prohibition may fail the test of religion neutrality.[2]

It does not necessarily follow from that observation, of course, that the First Amendment requires an exemption from Prohibition; that depends on the meaning of neutrality as the Free Exercise Clause embraces it. The point here is the unremarkable one that our common notion of neutrality is broad enough to cover not merely what might be called formal neutrality, which as a free-exercise requirement

---

Clause requires neutrality are also fairly read for the proposition that the Clause requires general applicability.

[2] Our cases make clear, to look at this from a different perspective, that an exemption for sacramental wine use would not deprive Prohibition of neutrality. Rather, "[s]uch an accommodation [would] 'reflec[t] nothing more than the governmental obligation of neutrality in the face of religious differences.'" *Wisconsin* v. *Yoder*, 406 U. S. 205, 235, n. 22 (1972) (quoting *Sherbert* v. *Verner*, 374 U. S. 398, 409 (1963)); see also *Lee* v. *Weisman*, 505 U. S. 577, 627 (1992) (SOUTER, J., concurring). The prohibition law in place earlier this century did in fact exempt "wine for sacramental purposes." National Prohibition Act, Title II, §3, 41 Stat. 308.

would only bar laws with an object to discriminate against religion, but also what might be called substantive neutrality, which, in addition to demanding a secular object, would generally require government to accommodate religious differences by exempting religious practices from formally neutral laws. See generally Laycock, Formal, Substantive, and Disaggregated Neutrality Toward Religion, 39 DePaul L. Rev. 993 (1990). If the Free Exercise Clause secures only protection against deliberate discrimination, a formal requirement will exhaust the Clause's neutrality command; if the Free Exercise Clause, rather, safeguards a right to engage in religious activity free from unnecessary governmental interference, the Clause requires substantive, as well as formal, neutrality.[3]

Though *Smith* used the term "neutrality" without a modifier, the rule it announced plainly assumes that free-exercise neutrality is of the formal sort. Distinguishing between laws whose "object" is to prohibit religious exercise and those that prohibit religious exercise as an "incidental effect," *Smith* placed only the former within the reaches of the Free Exercise Clause; the latter, laws that satisfy formal neutrality, *Smith* would subject to no free-exercise scrutiny at all, even when they prohibit religious exercise in application. 494 U. S., at 878. The four Justices who rejected the *Smith* rule, by contrast, read the Free Exercise Clause as embracing what I have termed substantive neutrality. The enforcement of a law "neutral on its face," they said, may "nonetheless offend [the Free Exercise Clause's] requirement

---

[3] One might further distinguish between formal neutrality and facial neutrality. While facial neutrality would permit discovery of a law's object or purpose only by analysis of the law's words, structure, and operation, formal neutrality would permit enquiry also into the intentions of those who enacted the law. Compare *ante*, at 540–542 (opinion of KENNEDY, J., joined by STEVENS, J.) with *ante*, p. 557 (opinion of SCALIA, J., joined by REHNQUIST, C. J.). For present purposes, the distinction between formal and facial neutrality is less important than the distinction between those conceptions of neutrality and substantive neutrality.

for government neutrality if it unduly burdens the free exercise of religion." *Id.*, at 896 (opinion of O'CONNOR, J., joined by Brennan, Marshall, and BLACKMUN, JJ.) (internal quotation marks and citations omitted). The rule these Justices saw as flowing from free-exercise neutrality, in contrast to the *Smith* rule, "requir[es] the government to justify *any* substantial burden on religiously motivated conduct by a compelling state interest and by means narrowly tailored to achieve that interest." *Id.*, at 894 (emphasis added).

The proposition for which the *Smith* rule stands, then, is that formal neutrality, along with general applicability, are sufficient conditions for constitutionality under the Free Exercise Clause. That proposition is not at issue in this case, however, for Hialeah's animal-sacrifice ordinances are not neutral under any definition, any more than they are generally applicable. This case, rather, involves the noncontroversial principle repeated in *Smith,* that formal neutrality and general applicability are necessary conditions for free-exercise constitutionality. It is only "this fundamental non-persecution principle of the First Amendment [that is] implicated here," *ante,* at 523, and it is to that principle that the Court adverts when it holds that Hialeah's ordinances "fail to satisfy the *Smith* requirements," *ante,* at 532. In applying that principle the Court does not tread on troublesome ground.

In considering, for example, whether Hialeah's animal-sacrifice laws violate free-exercise neutrality, the Court rightly observes that "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons," *ibid.*, and correctly finds Hialeah's laws to fail those standards. The question whether the protections of the Free Exercise Clause also pertain if the law at issue, though nondiscriminatory in its object, has the effect nonetheless of placing a burden on religious exercise is not before the Court

today, and the Court's intimations on the matter are therefore dicta.

The Court also rightly finds Hialeah's laws to fail the test of general applicability, and as the Court "need not define with precision the standard used to evaluate whether a prohibition is of general application, for these ordinances fall well below the minimum standard necessary to protect First Amendment rights," *ante,* at 543, it need not discuss the rules that apply to prohibitions found to be generally applicable. The question whether "there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability," *Yoder,* 406 U. S., at 220, is not before the Court in this case, and, again, suggestions on that score are dicta.

## II

In being so readily susceptible to resolution by applying the Free Exercise Clause's "fundamental nonpersecution principle," *ante,* at 523, this is far from a representative free-exercise case. While, as the Court observes, the Hialeah City Council has provided a rare example of a law actually aimed at suppressing religious exercise, *ante,* at 523–524, *Smith* was typical of our free-exercise cases, involving as it did a formally neutral, generally applicable law. The rule *Smith* announced, however, was decidedly untypical of the cases involving the same type of law. Because *Smith* left those prior cases standing, we are left with a free-exercise jurisprudence in tension with itself, a tension that should be addressed, and that may legitimately be addressed, by reexamining the *Smith* rule in the next case that would turn upon its application.

### A

In developing standards to judge the enforceability of formally neutral, generally applicable laws against the mandates of the Free Exercise Clause, the Court has addressed

the concepts of neutrality and general applicability by indicating, in language hard to read as not foreclosing the *Smith* rule, that the Free Exercise Clause embraces more than mere formal neutrality, and that formal neutrality and general applicability are not sufficient conditions for free-exercise constitutionality:

> "In a variety of ways we have said that '[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion.'" *Thomas*, 450 U. S., at 717 (quoting *Yoder, supra,* at 220).
>
> "[T]o agree that religiously grounded conduct must often be subject to the broad police power of the State is not to deny that there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability." 450 U. S., at 717.

Not long before the *Smith* decision, indeed, the Court specifically rejected the argument that "neutral and uniform" requirements for governmental benefits need satisfy only a reasonableness standard, in part because "[s]uch a test has no basis in precedent." *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 141 (1987) (internal quotation marks omitted). Rather, we have said, "[o]ur cases have established that '[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden.'" *Swaggart Ministries*, 493 U. S., at 384–385 (quoting *Hernandez* v. *Commissioner*, 490 U. S. 680, 699 (1989)).

Thus we have applied the same rigorous scrutiny to burdens on religious exercise resulting from the enforcement of formally neutral, generally applicable laws as we have applied to burdens caused by laws that single out religious ex-

ercise: "'only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.'" *McDaniel* v. *Paty*, 435 U. S., at 628 (plurality opinion) (quoting *Yoder, supra,* at 215). Compare *McDaniel, supra,* at 628–629 (plurality opinion) (applying that test to a law aimed at religious conduct) with *Yoder, supra,* at 215–229 (applying that test to a formally neutral, general law). Other cases in which the Court has applied heightened scrutiny to the enforcement of formally neutral, generally applicable laws that burden religious exercise include *Hernandez* v. *Commissioner, supra,* at 699; *Frazee* v. *Illinois Dept. of Employment Security,* 489 U. S. 829, 835 (1989); *Hobbie* v. *Unemployment Appeals Comm'n, supra,* at 141; *Bob Jones Univ.* v. *United States,* 461 U. S. 574, 604 (1983); *United States* v. *Lee,* 455 U. S. 252, 257–258 (1982); *Thomas, supra,* at 718; *Sherbert* v. *Verner,* 374 U. S. 398, 403 (1963); and *Cantwell* v. *Connecticut,* 310 U. S. 296, 304–307 (1940).

Though *Smith* sought to distinguish the free-exercise cases in which the Court mandated exemptions from secular laws of general application, see 494 U. S., at 881–885, I am not persuaded. *Wisconsin* v. *Yoder,* and *Cantwell* v. *Connecticut,* according to *Smith,* were not true free-exercise cases but "hybrid[s]" involving "the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, or the right of parents . . . to direct the education of their children." *Smith, supra,* at 881, 882. Neither opinion, however, leaves any doubt that "fundamental claims of religious freedom [were] at stake." *Yoder, supra,* at 221; see also *Cantwell, supra,* at 303–307.[4]

---

[4] *Yoder,* which involved a challenge by Amish parents to the enforcement against them of a compulsory school attendance law, mentioned the parental rights recognized in *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), as *Smith* pointed out. See *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S., at 881, n. 1 (citing *Yoder,* 406 U. S., at 233). But *Yoder* did so only to distinguish *Pierce,* which involved a

And the distinction *Smith* draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule, and, indeed, the hybrid exception would cover the situation exemplified by *Smith,* since free speech and associational rights are certainly implicated in the peyote ritual. But if a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what *Smith* calls the hybrid cases to have mentioned the Free Exercise Clause at all.

*Smith* sought to confine the remaining free-exercise exemption victories, which involved unemployment compensa-

---

substantive due process challenge to a compulsory school attendance law and which required merely a showing of " 'reasonable[ness].' " 406 U. S., at 233 (quoting *Pierce, supra,* at 535). Where parents make a "free exercise claim," the *Yoder* Court said, the *Pierce* reasonableness test is inapplicable and the State's action must be measured by a stricter test, the test developed under the Free Exercise Clause and discussed at length earlier in the opinion. See 406 U. S., at 233; *id.,* at 213–229. Quickly after the reference to parental rights, the *Yoder* opinion makes clear that the case involves "the central values underlying the Religion Clauses." *Id.,* at 234. The Yoders raised only a free-exercise defense to their prosecution under the school-attendance law, *id.,* at 209, and n. 4; certiorari was granted only on the free-exercise issue, *id.,* at 207; and the Court plainly understood the case to involve "conduct protected by the Free Exercise Clause" even against enforcement of a "regulatio[n] of general applicability," *id.,* at 220.

As for *Cantwell, Smith* pointed out that the case explicitly mentions freedom of speech. See 494 U. S., at 881, n. 1 (citing *Cantwell* v. *Connecticut,* 310 U. S., at 307). But the quote to which *Smith* refers occurs in a portion of the *Cantwell* opinion (titled: *"[s]econd,"* and dealing with a breach-of-peace conviction for playing phonograph records, see 310 U. S., at 307) that discusses an entirely different issue from the section of *Cantwell* that *Smith* cites as involving a "neutral, generally applicable law" (titled: *"[f]irst,"* and dealing with a licensing system for solicitations, see *Cantwell, supra,* at 303–307). See *Smith, supra,* at 881.

tion systems, see *Frazee, supra; Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136 (1987); *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707 (1981); and *Sherbert, supra,* as "stand[ing] for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." 494 U. S., at 884. But prior to *Smith* the Court had already refused to accept that explanation of the unemployment compensation cases. See *Hobbie, supra,* at 142, n. 7; *Bowen* v. *Roy,* 476 U. S. 693, 715–716 (1986) (opinion of BLACKMUN, J.); *id.,* at 727–732 (opinion of O'CONNOR, J., joined by Brennan and Marshall, JJ.); *id.,* at 733 (WHITE, J., dissenting). And, again, the distinction fails to exclude *Smith:* "If *Smith* is viewed as an unemployment compensation case, the distinction is obviously spurious. If *Smith* is viewed as a hypothetical criminal prosecution for peyote use, there would be an individual governmental assessment of the defendants' motives and actions in the form of a criminal trial." McConnell, Free Exercise Revisionism and the *Smith* Decision, 57 U. Chi. L. Rev. 1109, 1124 (1990). *Smith* also distinguished the unemployment compensation cases on the ground that they did not involve "an across-the-board criminal prohibition on a particular form of conduct." 494 U. S., at 884. But even Chief Justice Burger's plurality opinion in *Bowen* v. *Roy,* on which *Smith* drew for its analysis of the unemployment compensation cases, would have applied its reasonableness test only to "denial of government benefits" and not to "governmental action or legislation that criminalizes religiously inspired activity or inescapably compels conduct that some find objectionable for religious reasons," *Bowen* v. *Roy, supra,* at 706 (opinion of Burger, C. J., joined by Powell and REHNQUIST, JJ.); to the latter category of governmental action, it would have applied the test employed in *Yoder,* which involved an across-the-board criminal prohibition and which Chief Justice Burger's opinion treated as an ordinary free-

exercise case. See *Bowen* v. *Roy,* 476 U. S., at 706–707; *id.,* at 705, n. 15; *Yoder,* 406 U. S., at 218; see also *McDaniel* v. *Paty,* 435 U. S., at 628, n. 8 (noting cases in which courts considered claims for exemptions from general criminal prohibitions, cases the Court thought were "illustrative of the general nature of free-exercise protections and the delicate balancing required by our decisions in [*Sherbert* and *Yoder,*] when an important state interest is shown").

As for the cases on which *Smith* primarily relied as establishing the rule it embraced, *Reynolds* v. *United States,* 98 U. S. 145 (1879), and *Minersville School Dist.* v. *Gobitis,* 310 U. S. 586 (1940), see *Smith, supra,* at 879, their subsequent treatment by the Court would seem to require rejection of the *Smith* rule. *Reynolds,* which in upholding the polygamy conviction of a Mormon stressed the evils it saw as associated with polygamy, see 98 U. S., at 166 ("polygamy leads to the patriarchal principle, and . . . fetters the people in stationary despotism"); *id.,* at 165, 168, has been read as consistent with the principle that religious conduct may be regulated by general or targeting law only if the conduct "pose[s] some substantial threat to public safety, peace or order." *Sherbert* v. *Verner,* 374 U. S., at 403; see also *United States* v. *Lee,* 455 U. S., at 257–258; *Bob Jones University,* 461 U. S., at 603; *Yoder, supra,* at 230. And *Gobitis,* after three Justices who originally joined the opinion renounced it for disregarding the government's constitutional obligation "to accommodate itself to the religious views of minorities," *Jones* v. *Opelika,* 316 U. S. 584, 624 (1942) (opinion of Black, Douglas, and Murphy, JJ.), was explicitly overruled in *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 642 (1943); see also *id.,* at 643–644 (Black and Douglas, JJ., concurring).

Since holding in 1940 that the Free Exercise Clause applies to the States, see *Cantwell* v. *Connecticut,* 310 U. S. 296, the Court repeatedly has stated that the Clause sets strict limits on the government's power to burden religious exercise, whether it is a law's object to do so or its unantici-

pated effect. *Smith* responded to these statements by suggesting that the Court did not really mean what it said, detecting in at least the most recent opinions a lack of commitment to the compelling-interest test in the context of formally neutral laws. *Smith, supra,* at 884–885. But even if the Court's commitment were that palid, it would argue only for moderating the language of the test, not for eliminating constitutional scrutiny altogether. In any event, I would have trouble concluding that the Court has not meant what it has said in more than a dozen cases over several decades, particularly when in the same period it repeatedly applied the compelling-interest test to require exemptions, even in a case decided the year before *Smith.* See *Frazee* v. *Illinois Dept. of Employment Security,* 489 U. S. 829 (1989).[5] In sum, it seems to me difficult to escape the con-

---

[5] Though *Smith* implied that the Court, in considering claims for exemptions from formally neutral, generally applicable laws, has applied a "water[ed] down" version of strict scrutiny, 494 U. S., at 888, that appraisal confuses the cases in which we purported to apply strict scrutiny with the cases in which we did not. We did not purport to apply strict scrutiny in several cases involving discrete categories of governmental action in which there are special reasons to defer to the judgment of the political branches, and the opinions in those cases said in no uncertain terms that traditional heightened scrutiny applies outside those categories. See *O'Lone* v. *Estate of Shabazz,* 482 U. S. 342, 349 (1987) ("[P]rison regulations . . . are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights"); *Goldman* v. *Weinberger,* 475 U. S. 503, 507 (1986) ("Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society"); see also *Johnson* v. *Robison,* 415 U. S. 361, 385–386 (1974); *Gillette* v. *United States,* 401 U. S. 437, 462 (1971). We also did not purport to apply strict scrutiny in several cases in which the claimants failed to establish a constitutionally cognizable burden on religious exercise, and again the opinions in those cases left no doubt that heightened scrutiny applies to the enforcement of formally neutral, general laws that do burden free exercise. See *Jimmy Swaggart Ministries* v. *Board of Equalization of Cal.,* 493 U. S. 378, 384–385 (1990) ("Our cases have established that [t]he free exercise inquiry asks whether government

clusion that, whatever *Smith's* virtues, they do not include a comfortable fit with settled law.

B

The *Smith* rule, in my view, may be reexamined consistently with principles of *stare decisis.* To begin with, the *Smith* rule was not subject to "full-dress argument" prior to its announcement. *Mapp* v. *Ohio,* 367 U. S. 643, 676–677 (1961) (Harlan, J., dissenting). The State of Oregon in *Smith* contended that its refusal to exempt religious peyote use survived the strict scrutiny required by "settled free exercise principles," inasmuch as the State had "a compelling interest in regulating" the practice of peyote use and could not "accommodate the religious practice without compromis-

has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden") (internal quotation marks and citation omitted); *Lyng* v. *Northwest Indian Cemetery Protective Assn.,* 485 U. S. 439, 450 (1988) ("[T]his Court has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to [the] scrutiny" employed in *Sherbert* v. *Verner,* 374 U. S. 398 (1963); see also *Braunfeld* v. *Brown,* 366 U. S. 599, 606–607 (1961) (plurality opinion). Among the cases in which we have purported to apply strict scrutiny, we have required free-exercise exemptions more often than we have denied them. Compare *Frazee* v. *Illinois Dept. of Employment Security,* 489 U. S. 829 (1989); *Hobbie* v. *Unemployment Appeals Comm'n of Fla.,* 480 U. S. 136 (1987); *Thomas* v. *Review Bd. of Indiana Employment Security Div.,* 450 U. S. 707 (1981); *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940), with *Hernandez* v. *Commissioner,* 490 U. S. 680 (1989); *Bob Jones Univ.* v. *United States,* 461 U. S. 574 (1983); *United States* v. *Lee,* 455 U. S. 252 (1982). And of the three cases in which we found that denial of an exemption survived strict scrutiny (all tax cases), one involved the government's "fundamental, overriding interest in eradicating racial discrimination in education," *Bob Jones University, supra,* at 604; in a second the Court "doubt[ed] whether the alleged burden . . . [was] a substantial one," *Hernandez, supra,* at 699; and the Court seemed to be of the same view in the third, see *Lee, supra,* at 261, n. 12. These cases, I think, provide slim grounds for concluding that the Court has not been true to its word.

ing its interest." Brief for Petitioners in *Smith,* O. T. 1989, No. 88–1213, p. 5; see also *id.,* at 5–36; Reply Brief for Petitioners in *Smith,* pp. 6–20. Respondents joined issue on the outcome of strict scrutiny on the facts before the Court, see Brief for Respondents in *Smith,* pp. 14–41, and neither party squarely addressed the proposition the Court was to embrace, that the Free Exercise Clause was irrelevant to the dispute. Sound judicial decisionmaking requires "both a vigorous prosecution and a vigorous defense" of the issues in dispute, *Christiansburg Garment Co.* v. *EEOC,* 434 U. S. 412, 419 (1978), and a constitutional rule announced *sua sponte* is entitled to less deference than one addressed on full briefing and argument. Cf. *Ladner* v. *United States,* 358 U. S. 169, 173 (1958) (declining to address "an important and complex" issue concerning the scope of collateral attack upon criminal sentences because it had received "only meagre argument" from the parties, and the Court thought it "should have the benefit of a full argument before dealing with the question").

The *Smith* rule's vitality as precedent is limited further by the seeming want of any need of it in resolving the question presented in that case. JUSTICE O'CONNOR reached the same result as the majority by applying, as the parties had requested, "our established free exercise jurisprudence," 494 U. S., at 903, and the majority never determined that the case could not be resolved on the narrower ground, going instead straight to the broader constitutional rule. But the Court's better practice, one supported by the same principles of restraint that underlie the rule of *stare decisis,* is not to "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Ashwander* v. *TVA,* 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) (quoting *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39 (1885)). While I am not suggesting that the *Smith* Court lacked the power to announce its rule, I think a rule of law unnecessary to the outcome of a case, especially one not put

into play by the parties, approaches without more the sort of *"dicta* . . . which may be followed if sufficiently persuasive but which are not controlling." *Humphrey's Executor* v. *United States,* 295 U. S. 602, 627 (1935); see also *Kastigar* v. *United States,* 406 U. S. 441, 454–455 (1972).

I do not, of course, mean to imply that a broad constitutional rule announced without full briefing and argument necessarily lacks precedential weight. Over time, such a decision may become "part of the tissue of the law," *Radovich* v. *National Football League,* 352 U. S. 445, 455 (1957) (Frankfurter, J., dissenting), and may be subject to reliance in a way that new and unexpected decisions are not. Cf. *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833, 854–855 (1992). *Smith,* however, is not such a case. By the same token, by pointing out *Smith's* recent vintage I do not mean to suggest that novelty alone is enough to justify reconsideration. *"[S]tare decisis,"* as Justice Frankfurter wrote, "is a principle of policy and not a mechanical formula," *Helvering* v. *Hallock,* 309 U. S. 106, 119 (1940), and the decision whether to adhere to a prior decision, particularly a constitutional decision, is a complex and difficult one that does not lend itself to resolution by application of simple, categorical rules, but that must account for a variety of often competing considerations.

The considerations of full briefing, necessity, and novelty thus do not exhaust the legitimate reasons for reexamining prior decisions, or even for reexamining the *Smith* rule. One important further consideration warrants mention here, however, because it demands the reexamination I have in mind. *Smith* presents not the usual question of whether to follow a constitutional rule, but the question of which constitutional rule to follow, for *Smith* refrained from overruling prior free-exercise cases that contain a free-exercise rule fundamentally at odds with the rule *Smith* declared. *Smith,* indeed, announced its rule by relying squarely upon

the precedent of prior cases. See 494 U. S., at 878 ("Our decisions reveal that the . . . reading" of the Free Exercise Clause contained in the *Smith* rule "is the correct one"). Since that precedent is nonetheless at odds with the *Smith* rule, as I have discussed above, the result is an intolerable tension in free-exercise law which may be resolved, consistently with principles of *stare decisis,* in a case in which the tension is presented and its resolution pivotal.

While the tension on which I rely exists within the body of our extant case law, a rereading of that case law will not, of course, mark the limits of any enquiry directed to reexamining the *Smith* rule, which should be reviewed in light not only of the precedent on which it was rested but also of the text of the Free Exercise Clause and its origins. As for text, *Smith* did not assert that the plain language of the Free Exercise Clause compelled its rule, but only that the rule was "a permissible reading" of the Clause. *Ibid.* Suffice it to say that a respectable argument may be made that the pre-*Smith* law comes closer to fulfilling the language of the Free Exercise Clause than the rule *Smith* announced. "[T]he Free Exercise Clause . . . , by its terms, gives special protection to the exercise of religion," *Thomas,* 450 U. S., at 713, specifying an activity and then flatly protecting it against government prohibition. The Clause draws no distinction between laws whose object is to prohibit religious exercise and laws with that effect, on its face seemingly applying to both.

Nor did *Smith* consider the original meaning of the Free Exercise Clause, though overlooking the opportunity was no unique transgression. Save in a handful of passing remarks, the Court has not explored the history of the Clause since its early attempts in 1879 and 1890, see *Reynolds* v. *United States,* 98 U. S., at 162–166, and *Davis* v. *Beason,* 133 U. S. 333, 342 (1890), attempts that recent scholarship makes clear were incomplete. See generally McConnell, The Origins and Historical Understanding of Free Exercise of Religion,

103 Harv. L. Rev. 1409 (1990).[6]  The curious absence of history from our free-exercise decisions creates a stark contrast with our cases under the Establishment Clause, where historical analysis has been so prominent.[7]

This is not the place to explore the history that a century of free-exercise opinions have overlooked, and it is enough to note that, when the opportunity to reexamine *Smith* presents itself, we may consider recent scholarship raising serious questions about the *Smith* rule's consonance with the original understanding and purpose of the Free Exercise Clause.  See McConnell, The Origins and Historical Understanding of Free Exercise of Religion, *supra;* Durham, Religious Liberty and the Call of Conscience, 42 DePaul L. Rev. 71, 79–85 (1992); see also Office of Legal Policy, U. S. Dept. of Justice, Report to the Attorney General, Religious Liberty under the Free Exercise Clause 38–42 (1986) (predating *Smith*).  There appears to be a strong argument from the

---

[6] *Reynolds* denied the free-exercise claim of a Mormon convicted of polygamy, and *Davis* v. *Beason* upheld against a free-exercise challenge a law denying the right to vote or hold public office to members of organizations that practice or encourage polygamy.  Exactly what the two cases took from the Free Exercise Clause's origins is unclear.  The cases are open to the reading that the Clause sometimes protects religious conduct from enforcement of generally applicable laws, see *supra*, at 569 (citing cases); that the Clause never protects religious conduct from the enforcement of generally applicable laws, see *Smith*, 494 U. S., at 879; or that the Clause does not protect religious conduct at all, see *Yoder*, 406 U. S., at 247 (Douglas, J., dissenting in part); McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1488, and n. 404 (1990).

[7] See *Engel* v. *Vitale*, 370 U. S. 421, 425–436 (1962); *McGowan* v. *Maryland*, 366 U. S. 420, 431–443 (1961); *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 8–16 (1947); see also *Lee* v. *Weisman*, 505 U. S. 577, 612–616, 622–626 (1992) (SOUTER, J., concurring); *Wallace* v. *Jaffree*, 472 U. S. 38, 91–107 (1985) (REHNQUIST, J., dissenting); *School Dist. of Abington* v. *Schempp*, 374 U. S. 203, 232–239 (1963) (Brennan, J., concurring); *McGowan* v. *Maryland*, *supra*, at 459–495 (Frankfurter, J., concurring); *Everson*, *supra*, at 31–43 (Rutledge, J., dissenting).

Clause's development in the First Congress, from its origins in the post-Revolution state constitutions and pre-Revolution colonial charters, and from the philosophy of rights to which the Framers adhered, that the Clause was originally understood to preserve a right to engage in activities necessary to fulfill one's duty to one's God, unless those activities threatened the rights of others or the serious needs of the State. If, as this scholarship suggests, the Free Exercise Clause's original "purpose [was] to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority," *School Dist. of Abington* v. *Schempp*, 374 U. S., at 223, then there would be powerful reason to interpret the Clause to accord with its natural reading, as applying to all laws prohibiting religious exercise in fact, not just those aimed at its prohibition, and to hold the neutrality needed to implement such a purpose to be the substantive neutrality of our pre-*Smith* cases, not the formal neutrality sufficient for constitutionality under *Smith*.[8]

---

[8] The Court today observes that "historical instances of religious persecution and intolerance . . . gave concern to those who drafted the Free Exercise Clause." *Ante*, at 532 (internal quotation marks and citations omitted). That is no doubt true, and of course it supports the proposition for which it was summoned, that the Free Exercise Clause forbids religious persecution. But the Court's remark merits this observation: the fact that the Framers were concerned about victims of religious persecution by no means demonstrates that the Framers intended the Free Exercise Clause to forbid only persecution, the inference the *Smith* rule requires. On the contrary, the eradication of persecution would mean precious little to a member of a formerly persecuted sect who was nevertheless prevented from practicing his religion by the enforcement of "neutral, generally applicable" laws. If what drove the Framers was a desire to protect an activity they deemed special, and if "the [Framers] were well aware of potential conflicts between religious conviction and social duties," A. Adams & C. Emmerich, A Nation Dedicated to Religious Liberty 61 (1990), they may well have hoped to bar not only prohibitions of religious exercise fueled by the hostility of the majority, but prohibitions flowing from the indifference or ignorance of the majority as well.

The scholarship on the original understanding of the Free Exercise Clause is, to be sure, not uniform. See, e. g., Hamburger, A Constitutional Right of Religious Exemption: An Historical Perspective, 60 Geo. Wash. L. Rev. 915 (1992); Bradley, Beguiled: Free Exercise Exemptions and the Siren Song of Liberalism, 20 Hofstra L. Rev. 245 (1991). And there are differences of opinion as to the weight appropriately accorded original meaning. But whether or not one considers the original designs of the Clause binding, the interpretive significance of those designs surely ranks in the hierarchy of issues to be explored in resolving the tension inherent in free-exercise law as it stands today.

### III

The extent to which the Free Exercise Clause requires government to refrain from impeding religious exercise defines nothing less than the respective relationships in our constitutional democracy of the individual to government and to God. "Neutral, generally applicable" laws, drafted as they are from the perspective of the nonadherent, have the unavoidable potential of putting the believer to a choice between God and government. Our cases now present competing answers to the question when government, while pursuing secular ends, may compel disobedience to what one believes religion commands. The case before us is rightly decided without resolving the existing tension, which remains for another day when it may be squarely faced.

JUSTICE BLACKMUN, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

The Court holds today that the city of Hialeah violated the First and Fourteenth Amendments when it passed a set of restrictive ordinances explicitly directed at petitioners' religious practice. With this holding I agree. I write separately to emphasize that the First Amendment's protection of religion extends beyond those rare occasions on which the government explicitly targets religion (or a particular reli-

gion) for disfavored treatment, as is done in this case. In my view, a statute that burdens the free exercise of religion "may stand only if the law in general, and the State's refusal to allow a religious exemption in particular, are justified by a compelling interest that cannot be served by less restrictive means." *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872, 907 (1990) (dissenting opinion). The Court, however, applies a different test. It applies the test announced in *Smith,* under which "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Ante,* at 531. I continue to believe that *Smith* was wrongly decided, because it ignored the value of religious freedom as an affirmative individual liberty and treated the Free Exercise Clause as no more than an antidiscrimination principle. See 494 U. S., at 908–909. Thus, while I agree with the result the Court reaches in this case, I arrive at that result by a different route.

When the State enacts legislation that intentionally or unintentionally places a burden upon religiously motivated practice, it must justify that burden by "showing that it is the least restrictive means of achieving some compelling state interest." *Thomas* v. *Review Bd. of Indiana Employment Security Div.,* 450 U. S. 707, 718 (1981). See also *Wisconsin* v. *Yoder,* 406 U. S. 205, 215 (1972). A State may no more create an underinclusive statute, one that fails truly to promote its purported compelling interest, than it may create an overinclusive statute, one that encompasses more protected conduct than necessary to achieve its goal. In the latter circumstance, the broad scope of the statute is unnecessary to serve the interest, and the statute fails for that reason. In the former situation, the fact that allegedly harmful conduct falls outside the statute's scope belies a governmental assertion that it has genuinely pursued an interest "of the highest order." *Ibid.* If the State's goal is important enough to prohibit religiously motivated activity, it

will not and must not stop at religiously motivated activity. Cf. *Zablocki* v. *Redhail*, 434 U. S. 374, 390 (1978) (invalidating certain restrictions on marriage as "grossly underinclusive with respect to [their] purpose"); *Supreme Court of N. H.* v. *Piper*, 470 U. S. 274, 285, n. 19 (1985) (a rule excluding nonresidents from the bar of New Hampshire "is underinclusive . . . because it permits lawyers who move away from the State to retain their membership in the bar").

In this case, the ordinances at issue are both overinclusive and underinclusive in relation to the state interests they purportedly serve. They are overinclusive, as the majority correctly explains, because the "legitimate governmental interests in protecting the public health and preventing cruelty to animals could be addressed by restrictions stopping far short of a flat prohibition of all Santeria sacrificial practice." *Ante*, at 538. They are underinclusive as well, because "[d]espite the city's proffered interest in preventing cruelty to animals, the ordinances are drafted with care to forbid few killings but those occasioned by religious sacrifice." *Ante*, at 543. Moreover, the "ordinances are also underinclusive with regard to the city's interest in public health . . . ." *Ante*, at 544.

When a law discriminates against religion as such, as do the ordinances in this case, it automatically will fail strict scrutiny under *Sherbert* v. *Verner*, 374 U. S. 398, 402–403, 407 (1963) (holding that governmental regulation that imposes a burden upon religious practice must be narrowly tailored to advance a compelling state interest). This is true because a law that targets religious practice for disfavored treatment both burdens the free exercise of religion and, by definition, is not precisely tailored to a compelling governmental interest.

Thus, unlike the majority, I do not believe that "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Ante*, at 546. In my view, regulation that targets religion in this way, *ipso facto*, fails strict scrutiny. It is for this reason

that a statute that explicitly restricts religious practices violates the First Amendment. Otherwise, however, "[t]he First Amendment . . . does not distinguish between laws that are generally applicable and laws that target particular religious practices." *Smith*, 494 U. S., at 894 (opinion concurring in judgment).

It is only in the rare case that a state or local legislature will enact a law directly burdening religious practice as such. See *ibid.* Because respondent here does single out religion in this way, the present case is an easy one to decide.

A harder case would be presented if petitioners were requesting an exemption from a generally applicable anti-cruelty law. The result in the case before the Court today, and the fact that every Member of the Court concurs in that result, does not necessarily reflect this Court's views of the strength of a State's interest in prohibiting cruelty to animals. This case does not present, and I therefore decline to reach, the question whether the Free Exercise Clause would require a religious exemption from a law that sincerely pursued the goal of protecting animals from cruel treatment. The number of organizations that have filed *amicus* briefs on behalf of this interest,* however, demonstrates that it is not a concern to be treated lightly.

---

*See Brief for Washington Humane Society in support of Respondent; Brief for People for the Ethical Treatment of Animals, New Jersey Animal Rights Alliance, and Foundation for Animal Rights Advocacy in support of Respondent; Brief for Humane Society of the United States, American Humane Association, American Society for the Prevention of Cruelty to Animals, Animal Legal Defense Fund, Inc., and Massachusetts Society for the Prevention of Cruelty to Animals in support of Respondent; Brief for the International Society for Animal Rights, Citizens for Animals, Farm Animal Reform Movement, In Defense of Animals, Performing Animal Welfare Society, and Student Action Corps for Animals in support of Respondent; and Brief for the Institute for Animal Rights Law, American Fund for Alternatives to Animal Research, Farm Sanctuary, Jews for Animal Rights, United Animal Nations, and United Poultry Concerns in support of Respondent.