# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-01515-SCT

*LESTER SPELL, JR., D.V.M., COMMISSIONER OF THE MISSISSIPPI DEPARTMENT OF AGRICULTURE AND COMMERCE*

*v.*

*SUNI MUHAMMAD a/k/a D. W. WEBSTER*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 10/28/1997 |
| TRIAL JUDGE: | HON. J. LARRY BUFFINGTON |
| COURT FROM WHICH APPEALED: | LAWRENCE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ROBERT W. GRAVES |
| | AVERY MOUNGER LEE |
| ATTORNEY FOR APPELLEE: | ROBERT B. McDUFF |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 1/20/2000 |
| MOTION FOR REHEARING FILED: | 5/13/1999; granted 01/20/2000 |
| MANDATE ISSUED: | 01/27/2000 |

## EN BANC.

## PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

¶1. The Motion for Rehearing is granted. The per curiam affirmance by this Court on April 29, 1999, is withdrawn, and this opinion is substituted therefor.

### STATEMENT OF THE CASE

¶2. The Mississippi Department of Agriculture and Commerce, through its Commissioner, ("Department"), filed a complaint in the Chancery Court of Lawrence County on May 2, 1997, to enjoin Suni Muhammad from slaughtering animals in violation of the Mississippi Statutes and Meat Inspection Regulations. The Department alleged that Muhammad was "slaughtering, skinning, butchering, and processing cattle, goats, sheep and chickens in an open field in complete disregard of the most basic rules of cleanliness and sanitation" as well as selling the meat directly to consumers.

¶3. A hearing on the Department's request for a preliminary injunction was held on May 22, 1997, and the chancery judge entered a preliminary injunction, ordering Muhammad to cease operating a slaughterhouse but allowing him to continue his religious sacrifices. More testimony was taken at the hearing on the permanent injunction and, in his final order, the chancellor again ordered that Muhammad was prohibited

from operating "an illegal slaughterhouse" but allowed Muhammad to slaughter animals "while engaged in a religious ceremony". These animals, however, could not be sold to the public.

¶4. The Department appealed the Chancellor's judgment. The Chancellor's judgment was affirmed per curiam by this Court on April 29, 1999. Rehearing was granted, and this opinion now issues.

## SUMMARY OF TESTIMONY

¶5. Muhammad testified that he had been slaughtering sheep, goats and cows in accordance with Islamic religious law since 1975. In 1983, he moved from California to Mississippi where he continued this practice on his mother's twenty-three acre property at Silver Creek. Muhammad slaughters the animals in an open field. He disposes of the pieces he does not use in a ditch after letting the cats and other animals eat their share.

¶6. Mostafiz Chowdhury, an engineer with the U.S. Army Corp of Engineers in Vicksburg testified that the Muslim religion requires a new father to slaughter a goat twenty-one days after the birth of a child. After his daughter was born, Chowdhury called Muhammad and requested that he find a goat of the required age. When Chowdhurry arrived for the sacrifice, Muhammad had a few goats available and Chowdhury selected one. Chowdbury then slaughtered the goat, as required in his role as the new father, with the assistance of Muhammad. As Chowdhurry explained, his religion requires that after the birth of a new child

> the parent is supposed to slaughter a goat or sheep or animal. The meaning of that, you know, since this is the trust to us, the children. And, you know, when we slaughter something then we are sacrificing for Allah, so that all of her sins will be waived. And like we are giving her hair for the hair, and eye for the eyes, nose for the nose. So that goats will go to hell fire instead of her. It's religious.

Chowdhurry also purchased five chickens from Muhammad. For the slaughter of the goat and the purchase of the five chickens, Chowdurry paid $95.

¶7. Bina Saleh, a twenty year old Millsaps College student, testified that Muhammad had delivered some chickens to her house some months before. Her family purchased the chickens from Muhammad because they are "halal" i.e. slaughtered in the manner required by Muslim law.

¶8. Lou Holder works at Southeast Mississippi Livestock in Hattiesburg. Muhammad had purchased 169 head of goat, sheep and cattle from the company since Jan., 1996, and 41 heads had been sold in his name.

¶9. Melvin Wells, a regulatory inspector with the Mississippi Department of Agriculture testified that he inspects live animals prior to slaughter to insure they are disease free. After the slaughtering, inspections are done to see that the animals are clean. He also checks slaughterhouses for cleanliness, sanitation, etc. On April 16, 1997, Wells observed Muhammad slaughter twelve animals, then rinse them down and cut them. After the meat was placed in bags or boxes, it was placed in a van. The van was then driven to Metairie, Louisiana.

¶10. Wells executed a search warrant on the property two days later. Wells testified that the band saw used to cut up the meat was not in a clean and sanitary condition.

¶11. James Meadows, deputy director with the Department, testified concerning state and federal laws governing the inspection of meat. In 1968, Congress passed the Wholesome Meat Act which required that

all meat sold to consumers be inspected by either federal or state inspectors. Muhammad's name is not on the Department's list of registered meat dealers in the state. Nor have state inspectors ever examined the grounds on which Muhammad slaughters animals. On April 18, Meadows inspected the area used by Muhammad in his operation. He testified that the "conditions were not anywhere close to what we require as far as what would be an acceptable facility." In his opinion, Muhammad's operation would not be approved as a slaughterhouse by the state of Mississippi.

¶12. Meadows testified that the Humane Slaughter Act allows persons of the Islamic faith to slaughter their animals by cutting their throats. Under the law, however, Muslims are not exempted from the sanitation requirements if they operate a slaughterhouse.

¶13. Akbar Shaheed is a counselor at the Pine Grove Recovery Center. He is a Muslim and practices the Muslim religion of Islam. Muslims have a ritual way of slaughtering animals that requires the animal to face East (towards Mecca). The animal is then calmed and his throat is cut. Muslims have a mosque on the USM campus where a freezer is kept to hold meat. Muhammad brought chicken meat there about once a month.

¶14. Abdul Latif Taj is Muslim and has a master's degree in Islamic studies. He owns a meat plant in Bassfield called Musbax Taj Halal Meat Plant. His plant slaughters goats, sheep and cows and sells them to Muslims. The State Department of Agriculture inspects his plant twice a week.

¶15. Herbert Hobbs is a compliance officer with the United States Department of Agriculture (USDA) in Nashville. He investigates complaints regarding clandestine slaughter operations. He observed Muhammad's operations over a two day period (April 15-16, 1997). Hobbs made a videotape of what he saw - the slaughter of some twelve sheep.

¶16. Preston Lee is a regulatory service supervisor with the USDA. He and a compliance officer went to Muhammad's property to investigate complaints of illegal slaughter in January, 1996. Three carcasses were hanging out in the open. Muhammad told the inspectors that he intended to sell the carcasses after processing them. They informed him that he could not do so and that if he promised to stop, they would issue a warning letter and allow him to keep the three carcasses for his own use.

¶17. Lee was also involved in the surveillance of Muhammad's operation that took place in April, 1997. On April 18, 1997, they executed a search warrant. The band saw used to cut up the meat had scraps of meat in it. Animal hides had been thrown over the fence or were just lying on the ground. Lee opined that Muhammad's facility did not meet state and federal laws with regard to meat inspection and slaughterhouse sanitation. Lee stated that Muslims can buy their meat at the Musbax Taj Halal Meat Processing Plant in Bassfield.

¶18. For personal use, Lee testified, a person does not have to have an approved facility. There is also the custom exemption which allows a person to bring his own animal to a custom slaughterer. The customer is permitted to use the animal for himself or persons in his household. The custom slaughterer, however, must meet the same sanitation requirements as an inspected facility does.

¶19. Robert Ragland is a branch chief with the USDA. Ragland was accepted as an expert witness in meat inspection. Muhammad's operation is not a federally licensed plant and, thus, may not ship meat or meat products across state lines. Ragland reviewed the videotape and photos taken by Hobbs in April, 1997.

Ragland stated that in his opinion, Muhammad's slaughter operation was not in compliance with federal meat inspection laws. Under the personal use exemption of the Federal Meat Inspection Act[1], a person slaughtering an animal he owns for use by himself or his household does not have to comply with the requirements. A custom operation does have to comply.

¶20. Saqib Hasan testified via deposition. Hasan is a physician specializing in Internal Medicine. He is Muslim. Hasan testified concerning the practice of ritual slaughter in the Muslim religion. The animal is slaughtered in the name of Allah and the throat must be cut in such a way that all the animal's blood leaves the meat. Hasan testified that he knows of nothing in his religion that would prevent the animal from being inspected by a government inspector. In January or February, 1997, Hasan purchased a goat and 30 chickens from Muhammad. Hasan paid approximately $150 for the meat which was delivered in a large box.

## THE CHANCELLOR'S RULING

¶21. The chancellor entered his order on October 28, 1997. That order directed Muhammad to cease operating "an illegal slaughterhouse" but allowed Muhammad to "slaughter animals while engaged in a religious ceremony." Thus, if persons of the Muslim faith request that he slaughter animals, he may do so for those individuals "provided that said individuals participate in the religious ceremony."

¶22. "He is further not prohibited from giving any meat that he has slaughtered in the custom of his religion, however he shall not be allowed to accept any payment for the purchase of meat and may be paid only for a religious ceremony."

¶23. "In the event that he slaughters any animals in the observance of a religious ceremony he is required for the health and well being of the community to dispose of the carcass and by-products so as to not create a health hazard in his community."

## STATEMENT OF THE ISSUE

**I. WHETHER THE CHANCELLOR'S ORDER ENJOINING ONLY THE SELLING OF MEAT RITUALLY SLAUGHTERED BY SUNI MUHAMMAD WHILE ALLOWING HIM TO GIVE THE MEAT AWAY AND CHARGE FOR THE RELIGIOUS SERVICE IS A MISAPPLICATION OF MISS. CODE ANN. § 75-33-3(3).**

## DISCUSSION OF THE LAW

¶24. The Chancellor's order allowing Muhammad to charge for the religious service of ritual slaughter provided that the person employing such religious service also participates in the slaughter and to give the meat away is in violation of Miss. Code Ann. §75-33-3(3) (Supp. 1999). This order essentially allows Muhammad to receive payment for the slaughter of an animal under the ruse of a religious ceremony, thus circumventing the health and safety standards imposed upon slaughterhouses. Such an accommodation of religion is not required.[2]

¶25. "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). It is manifestly clear that there is a legitimate state interest in protecting the health of consumers by imposing sanitary regulations upon

the slaughtering of animals, regarding disposal of the carcass and consumption of the meat. ***Id.***

¶26. Muhammad argues that the Chancellor's order is consistent with Mississippi law. Miss. Code Ann. §75-33-3(3) provides the following "ritual slaughter" exception to "The Meat, Meat-Food and Poultry Regulation and Inspection Law of 1960":

> The slaughtering by any person of animals and poultry of his own raising and the processing and transportation by him of animals and poultry products exclusively for use by him and members of his household and his nonpaying guests and employees, shall be exempt from the provisions of this article. Any other operations of an unlicensed, unapproved slaughterhouse and/or processing facility to escape the provisions of this article shall be unlawful, and any other person found guilty of such violation shall be punished as provided in Section 75-33-37.

Muhammad argues that under the Chancellor's order he does not violate Mississippi law.

¶27. Pared to its essential elements, this case is a dispute over whether the exception to Mississippi's meat inspection law, Miss. Code Ann. §75-33-3(3), allows Muhammad to have persons come to him for assistance with their religious obligations, purchase an animal from Muhammad, pay for Muhammad's assistance with a religious ceremony (ritual slaughter) and then be permitted to leave with the meat. Muhammad asserts that he fits into the exception carved out for ritual slaughter because he gives the meat away and only charges for the ritual slaughter, thus transforming the person who is a customer for purposes of the ritual slaughter into a non-paying guest for purposes of the meat.

¶28. This activity does not violate Mississippi's meat inspection laws if one can believe, as argued by Mohammad, that the visitor can be a paying guest for purposes of the religious ceremony but a non-paying guest vis-a-vis the meat. This is a strained argument which ignores the plain meaning of both "non-paying guest" and the terms of the statute taken as a whole. Clearly, Miss. Code Ann. §75-33-3(3) exempts private use of the slaughtered animal and not commercial use. Muhammad's actions violate both the language and the spirit of the Mississippi law which seeks to protect the health of consumers by requiring the sanitary operation of slaughterhouses.

¶29. The chancellor's concern for not violating Muhammad's (or his customers') First Amendment rights, while commendable, resulted in his allowing Muhammad greater freedoms than either the statute or the First Amendment requires. There is nothing to prevent persons desirous of keeping their faith from hiring Muhammad to assist them in slaughtering animals they have raised at their own homes. Muhammad's willingness to allow his own property to be a slaughterhouse no doubt made it much easier for other persons to adhere to their religious laws, but in so doing, Muhammad failed to adhere to the laws of Mississippi.

¶30. The Chancellor's order is reversed, and the case is remanded for the issuance of an injunction in conformity with this opinion.

¶31. **REVERSED AND REMANDED.**

> **PRATHER, C.J., SULLIVAN, P.J., BANKS, McRAE, SMITH, MILLS, WALLER AND COBB, JJ., CONCUR.**

---

1. These exceptions are codified at 21 U.S.C.A.§623(a).

2. Both federal and state law provides for a slaughter exception which allows an individual to slaughter an animal he has raised for the consumption of himself, members of his household, employees or non-paying guest(s).