COPE, J.
Mynor Solano appeals his conviction for second-degree murder, claiming that there is a reversible evidentiary error and contending that there is fundamental error in a jury instruction. We conclude that while there was an evidentiary error, the error is harmless under the circumstances of this case, and we reject the claim of fundamental error with regard to the jury instruction.
Defendant-appellant Solano had a romantic and sexual relationship with the victim, Gregorio Rodriguez, for approximately four years. Eventually the victim began dating another man and the defendant found out about it. The defendant and the victim quarreled about this. The State contended that the defendant had killed the victim out of jealousy. The defendant testified that during the quarrel, the victim attacked him and the defendant killed the victim in self-defense.
The first question is whether the trial court erred by admitting into evidence a small cauldron in which the murder weapon, a hammer, was found. When the police searched the defendant’s apartment, they found the cauldron in the defendant’s closet. The cauldron, which might otherwise be described as a miniature black kettle, is about six inches across and six inches tall. It contained 20 small sticks, a knife, a small stake,[1] and the murder weapon. The police photographed the hammer in the cauldron as they found it.
*932 Prior to trial, the defense filed a motion in limine seeking to exclude the cauldron, and photographs of the cauldron, from evidence. The defendant practices Santería, a religion which is controversial because its practices include animal sacrifice. See Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). According to the defense, the cauldron was an object which was related to the defendant’s practice of Santería. The defense argued that the unfair prejudice from introducing the cauldron and photos into evidence would outweigh whatever marginal relevance the object might have. See § 90.403, Fla. Stat. (2007). The court precluded the introduction of several items which would connect the defendant with Santería. The State contended, however, that it was permissible to introduce the cauldron and photos to show chain of custody of the murder weapon.
The trial court allowed the cauldron and two photographs to come into evidence, but prohibited the parties from mentioning Santería, or the purpose of the cauldron and its contents. The court also allowed the cauldron and sticks to be introduced into evidence and shown to the jury.[2] In closing argument, the prosecutor mentioned the cauldron several times and said “A person who is defending himself does not take those items [the victim’s property] and put them in a cauldron in a closet surrounded by candles.”
We respectfully disagree with the trial court regarding the ruling on this motion in limine. In this case the defendant had admitted killing the victim with the hammer and the entire issue was whether he had done so in self-defense. All the jury needed to know was the undisputed fact that the hammer had been found in the defendant’s closet, a point the defense conceded. As the defense argued, if the hammer had been found in a wastebasket instead of a cauldron, it is unlikely that the State would have sought to introduce the wastebasket into evidence. In any event, there was an unacceptable risk that one or more jurors would know, or guess, the purpose of the cauldron and its contents— and any such juror knowledge or speculation would not be favorable to the defendant. We therefore conclude that the unfair prejudice outweighed the probative value, if any. See State v. Williams, 992 So.2d 330, 333-34 (Fla. 3d DCA 2008). The item should have been excluded.
Under the circumstances of this case, however, we conclude that the error was harmless beyond a reasonable doubt. That is so because the Medical Examiner’s testimony demonstrated that the murder could not have occurred in the way that the defendant testified. By the defendant’s account, the defendant and the victim quarreled about the new boyfriend the victim was seeing. The conversation became heated and according to the defendant, the victim said “go to hell, I feel like killing you.” The defendant said he then concluded that “before he does it, I’ll do it myself.” The defendant stated that the victim was seated on the edge of the bed. According to the defendant, the victim leaned forward to grab an exercise dumbbell, apparently intending to use the dumbbell to attack the defendant. The defendant stated that he grabbed a hammer which was on the floor. The defendant stated that he struck the victim on the back of the head with the hammer and pushed him on the bed. According to the defendant, the victim fell face down onto the bed and the defendant hit him with the hammer two more times.
*933 The Medical Examiner testified that this scenario was highly unlikely. The victim was killed with three severe hammer blows to the top and upper rear portion of the skull. The Medical Examiner said that after the first blow, the victim likely would have fallen to the floor and been incapacitated.
When the victim was found, he was in his bed, lying on his stomach with his arms moderately outstretched along each side of his head. His shirt was off. His glasses, which he always wore, were neatly folded and being held in the victim’s left hand. There was extensive blood spattered on the headboard of the bed and the wall above the headboard. There was no blood trail, no physical evidence that the body had been moved, and no testimony by the defendant that he had moved the body.
By the defendant’s account, the defendant struck the -victim while he was seated on the edge of the bed and was reaching downward. According to the Medical Examiner’s testimony, the victim likely would have fallen and not been able to move. Under the defendant’s account, despite receiving this blow, the victim would have had to stand up, be pushed by the defendant and turn around, collapse on the bed, and remove his own glasses, after which the defendant struck two more severe blows which caused blood spatter all over the headboard and wall above the headboard. Given the Medical Examiner’s testimony, no reasonable juror could have accepted the defendant’s account of the murder.[3]
By the defendant’s account the victim lived for two or three minutes. Although the defendant professed great love for the victim, he did not summon emergency assistance. Instead he stayed in the victim’s apartment for two hours, in which he used the victim’s cellphone to take pictures of the now-deceased victim. Claiming that he was owed money, the defendant took the victim’s wallet, laptop computer, and two cellphones, plus the victim’s family photographs. The defendant used the victim’s cellphones to send text messages pretending to be the victim. These included a message to the victim’s new boyfriend (about whom the victim and the defendant had quarreled), telling the new boyfriend that the victim was breaking up with him. We are satisfied that the evidentiary error regarding the cauldron is harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
The second question on appeal is whether there was fundamental error in the manslaughter jury instruction in this case. The First District has found fundamental error with regard to a portion of the manslaughter-by-act standard jury instruction which “provides that the State had to prove that Appellant ‘intentionally caused [the victim’s] death’ in order to establish that he committed manslaughter.” Montgomery v. State, — So.3d —, —, 2009 WL 350624 (Fla. 1st DCA 2009), review granted, 11 So.3d 943 (Fla.2009). The problem is that a specific intent to kill is not required for second-degree murder, but that phrase is included in the manslaughter-by-act instruction, even though it is a lesser included offense. *934 See Montgomery, — So.3d at —. This court has certified conflict with Montgomery, and has instead followed the Second District’s decision in Zeigler v. State, 18 So.3d 1239 (Fla. 2d DCA 2009). Valdes-Pino v. State, 23 So.3d 871 (Fla. 3d DCA 2009); see also Bonilla v. State, 23 So.3d 1256 (Fla. 3d DCA 2009).
Assuming arguendo that Montgomery is correctly decided, the defendant would not be entitled to any relief under the fundamental error doctrine. That is so because the defense requested, and the trial judge gave, a special instruction making the point that if the defendant was found to have used excessive force in self-defense, then the jury could convict on manslaughter. The jury instructions read, in part, as follows with the special instruction being in bold face type:
I now instruct you on the circumstances that must be proved before My-nor Solano may be found guilty of murder in the second degree or any lesser included crime.
Murder in the second degree:
Before you can find the defendant guilty of second degree murder, the state must prove the following three elements beyond a reasonable doubt:
(1) Gregorio Rodriguez is dead.
(2) The death was caused by the criminal act of Mynor Solano.
(3)There was an unlawful killing of Gregorio Rodriguez by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life.
[[Image here]]
An act is imminently dangerous to another and demonstrating a depraved mind if it is an act or series of acts that:
(1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another and;
(2) is done from ill will, hatred, spite or an evil intent, and,
(3) is of such a nature that the act itself indicates an indifference to human life.
In order to convict of second degree murder, it is not necessary for the state to prove the defendant had an intent to cause death.
[[Image here]]
Before you can find the defendant guilty of manslaughter, the state must prove the following two elements beyond a reasonable doubt:
1. Gregorio Rodriguez is dead.
2. Mynor Solano intentionally caused the death of Gregorio Rodriguez.
I further instruct you that if you find that the defendant over-reacted [and] used excessive force to defend himself from the attack of the victim, [and that] such excessive force resulted in the death of the victim, then manslaughter is proven.*
(Emphasis added).
In this appeal the defense argues that, even though the trial court gave the defense-requested instruction, the instruction failed to eliminate or modify item 2 of the manslaughter instruction, which stated “Mynor Solano intentionally caused the death of Gregorio Rodriguez.” That language was left in place and the court added the special instruction to it.
We conclude that the special instruction sufficiently addressed the issue under the circumstances of this case. The defense *935 wanted the court to spell out that if the defendant used excessive force in self-defense, then the defendant could be convicted of manslaughter, and that is what the special jury instruction said. We conclude that there is no fundamental error.
Affirmed.
GERSTEN, J., concurs.

. While described in the transcript as a stake, it appears to be a railroad spike.

. Prior to doing this, the stake and knife were removed from the cauldron.

. As argued by the State in closing, there is a scenario which is consistent with all of the physical evidence. In his statement to the police, the defendant said that he and the victim had given each other massages before they quarreled. The victim’s body was lying on his stomach with the head turned to one side. The victim's shirt was off. The victim’s glasses were neatly folded and being held in his left hand. This position is consistent with someone who was expecting a massage, or was napping, and received three fatal hammer blows to the head.

 The bracketed words were in the written jury instructions but were not in the transcript of the oral reading of the jury instructions. The written jury instructions were given to the jury-