[Cite as *In re T.K.*, 2014-Ohio-576.]

STATE OF OHIO              )          IN THE COURT OF APPEALS
                          )ss:        NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT          )

IN RE: T.K.                           C.A. No.      26916


                                      APPEAL FROM JUDGMENT
                                      ENTERED IN THE
                                      COURT OF COMMON PLEAS
                                      COUNTY OF SUMMIT, OHIO
                                      CASE No.      DN 12-03-0152

DECISION AND JOURNAL ENTRY

Dated: February 19, 2014

CARR, Judge.

{¶1}    Appellant, Sara L. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division.  This Court affirms.

I.

{¶2}    Mother and Dennis K. ("Father") are the unmarried parents of T.K., born March 7, 2012.  When T.K. tested positive for marijuana at his birth, Summit County Children Services ("CSB") initiated proceedings in juvenile court based on allegations of abuse and dependency.  At the shelter care hearing, the parents stipulated to probable cause for removal of the child and agreed to T.K.'s placement in the emergency temporary custody of the maternal grandparents ("grandparents") under the protective supervision of CSB.  One month before T.K.'s birth, the same grandparents had been granted legal custody of the first-born child of Mother and Father, Ty.K, born May 16, 2009.  That child had been placed with the grandparents since he was one-year old, following an adjudication of abuse, neglect, and dependency.

{¶3} In regard to T.K., the parents initially declared an intention to regain his custody. They stipulated to allegations of abuse, under R.C. 2151.031(C), and dependency, under R.C. 2151.04(D), and received a case plan requiring them to maintain a sober lifestyle, increase their parenting knowledge, and participate in mental health assessments. At the June 2012 dispositional hearing, the parents agreed with CSB's request for temporary custody and placement with the grandparents.

{¶4} In August 2012, CSB moved for legal custody to the grandparents based on the parents' lack of case plan progress, their poor record of visiting, a lack of bonding, and the child's need for permanence. T.K. was reportedly doing well in the grandparents' home where he resided with his older brother. Mother moved for legal custody to herself with protective supervision in the agency, but subsequently withdrew that request.

{¶5} At the final hearing in the trial court, both parents waived trial on CSB's motion and consented to an award of legal custody to the grandparents. On December 31, 2012, the magistrate granted legal custody of the ninth-month-old child to the grandparents. The parents objected to the magistrate's decision, claiming a lack of reasonable efforts findings and an erroneous interpretation of the privilege to determine the religious affiliation of the child. The trial court overruled the objections and issued judgment on May 6, 2013. Mother now appeals from the judgment of the trial court and assigns two errors for review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT'S FAILURE TO ISSUE WRITTEN FINDINGS OF FACT STATING THE REASONS SUPPORTING ITS "REASONABLE EFFORTS" DETERMINATIONS CONSTITUTES PREJUDICIAL AND REVERSIBLE ERROR AS A MATTER OF LAW.

{**¶6**}    Mother argues that the trial court erred in failing to make a finding that the agency made reasonable efforts to prevent the continued removal of the child from the parents' care and in failing to issue written findings of fact setting forth the reasons supporting its determination as required by R.C. 2151.419(A)(1) and (B)(1). *See In re J.G.,* 9th Dist. Summit No. 12CA0037, 2013-Ohio-417, ¶ 31.

{**¶7**}    The magistrate had found that CSB "made all reasonable efforts to prevent the continued need for removal of this child from the parents' care," encouraged the parents to complete case plan services, and found that a return of the child to the parents' at the present time was contrary to the child's best interest. The magistrate also acknowledged and adopted "the parties' agreement that custody with the grandparents is in the child's best interest."

{**¶8**}    Mother raised this matter in her objections to the magistrate's decision. The trial court overruled Mother's objection on the grounds that (1) the magistrate did, in fact, make a finding of reasonable efforts; (2) the magistrate found that the agency's efforts included encouraging the parents to complete case plan services; and (3) that Mother had, in any event, agreed to the award of legal custody to the grandparents. The trial judge found the magistrate's reasonable efforts finding to be sufficient and further found that Mother could not object to the finding because she had agreed to the granting of legal custody to the grandparents.

{**¶9**}    Even assuming an insufficiency under the statute in the reasonable efforts findings, under the circumstances of this case, we agree with the trial court's conclusion that Mother cannot assert error in the trial court's failure to prevent something to which she had agreed. The record reflects that Mother not only consented to the award of legal custody to the grandparents, but also specifically waived her right to trial under circumstances where Mother was represented by counsel. There is nothing in the record to suggest that Mother did not

understand the import of her decisions. The Fourth District has similarly held that by "stipulating to [her daughters'] disposition, [the mother] implicitly agreed to all aspects of that disposition, including the fact that the agency made reasonable efforts to eliminate the girls' continued removal from their home." *In re Ohm*, 4th Dist. Hocking No. 05CA1, 2005-Ohio-3500, ¶ 50.

{¶10} Accordingly, Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN LIMITING PARENTS' RIGHT TO DETERMINE THE JUVENILE'S RELIGIOUS AFFILIATION.

{¶11} Mother contends that the trial court erred in too narrowly interpreting the statutory privilege to determine her child's religious affiliation under R.C. 2151.353(A)(3)(c). She argues that the statute not only permits her to determine the child's religious affiliation as "none" and thereby bar the custodians from engaging him in church activities designed for membership, but also entitles her to an order that the legal custodians "shall not in any way, teach, indoctrinate, or actively expose T.K. to any religion, Catholic or otherwise." For the following reasons, we find the argument to be without merit.

{¶12} Following the adjudication of T.K. as an abused and dependent child, the trial court granted legal custody of the child to the maternal grandparents. R.C. 2151.353(A)(3). "Legal custody," as that term is used in R.C. Chapter 2151, means "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21). Legal custody

is intended to be permanent in nature, and the named legal custodians are to assume responsibility for the care and supervision of the child until the child reaches the age of majority. R.C. 2151.353(A)(3)(a) and (b). In addition, the juvenile court retains jurisdiction over any child for whom it issues an order of disposition pursuant to this section until the child attains the age of eighteen years. R.C. 2151.353(E)(1).

{¶13} "Residual parental rights, privileges, and responsibilities" as that term is used in R.C. Chapter 2151, are "those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, *the privilege to determine the child's religious affiliation*, and the responsibility for support." (Emphasis added.) R.C. 2151.011(B)(48). *See also* R.C. 2151.353(A)(3)(c), similarly describing residual parental rights, privileges, and responsibilities.

{¶14} The subject of Mother's privilege to determine her child's religious affiliation was initially raised before the magistrate during consideration of CSB's motion for legal custody to the grandparents. Mother first affirmed that she waived her right to trial and consented to the transfer of T.K. into the legal custody of the grandparents, and further indicated that she understood such waiver and consent are intended to be permanent. Father made the same waiver and consent. At that point, and in regard to the parent's residual parental rights, privileges and responsibilities, Mother's attorney asserted that the parents objected to the grandparents raising T.K. in the Catholic faith. Mother stated: "I would rather not have * * * him raised as any type of religion, because I feel like that's something that when he gets older he can decide for himself." Mother added that she would rather the child not go to mass. In response to a request

to suggest a nondenominational prayer that might be shared at bedtime, Mother stated: "I would just rather keep religion out of it completely."

{¶15} Mother's attorney reported to the court that his client "is opposed to not just the religious affiliation, such as a baptism, but also any religious upbringing or indoctrination or teaching of that faith." When Mother was asked if she wanted T.K. raised as an atheist or agnostic, she replied:

> I don't feel like I should push any type of religion on him, on either one. I feel like they should grow up and decide. And whether they want to have their crosses in the house, I don't care about that. They can talk about God however they want to. I just don't want them to say that -- like give them ideas that -- okay, you know, all the stuff that's in the Bible, like, I don't want them taught stuff that's in the Bible. I want them to grow up and make their own decisions. * * * It's their decision when they get older whether they want to believe in God or not.

Mother's determination of her child's religious affiliation was indicated to be "none."

{¶16} Thereupon, the magistrate issued a decision, granting legal custody to the grandparents and indicating that both parents had agreed to the award. In addition, the magistrate found that the parents wanted the child to have no religious affiliation. The magistrate acknowledged the grandparents' right to exercise their own faith and found that the parents recognized that right as well. Accordingly, the magistrate observed that it would not be possible to avoid all exposure of the child to the Catholic faith. The magistrate relied upon a common and ordinary definition of affiliation, and construed it as meaning "to be adopted a member of a particular organization or association." Therefore, she found that the parents were entitled to require simply that the grandparents not engage the child in church activities or rituals designed for such membership, including those required for membership into the Catholic Church.

{¶17} Mother objected to this finding by the magistrate and argued that it was too narrow of an interpretation of her residual parental privilege to determine her child's religious affiliation. She claimed that the privilege should extend to all matters involving religion. Mother, therefore, sought reversal of the magistrate's decision and an order that legal custodians "shall not in any way, teach, indoctrinate, or actively expose the child to any religion, Catholic or otherwise."

{¶18} In overruling Mother's objection, the trial judge noted that the statute does not define "religious affiliation" and that Ohio case law offers no guidance on the meaning of the term. The court found that the magistrate did not err in her determination of the scope of the parents' residual privilege, and also found that the court was unable to place too great a burden on the legal custodians. The trial judge specifically found that "exposure is not tantamount to affiliation" and that Mother's desire to prevent the child's exposure to any religious practice is impractical. Accordingly, the trial court fundamentally adopted the decision of the magistrate and ordered the legal custodians to not engage the child in church activities designed for membership, including rituals necessary for membership into the Catholic Church. Further, because the parties decided to reach a mutually agreeable visitation schedule, the court also ordered that the parties should utilize the scheduling of their visitation times to facilitate the parents' right to determine the child's religious affiliation as well as the legal custodians' right to exercise their religious beliefs.[1]

---

[1] On appeal, Mother questions the meaning of the trial court's statement that the parties should use the scheduling of their visitation times to facilitate the parents' right to determine the child's "religious affiliation" and the legal custodians' right to exercise their religious beliefs. It seems reasonable to conclude that one possible example might be for the parents to care for the child while the grandparents attend their own religious services.

{¶19} On appeal, Mother claims that the juvenile court erred in too narrowly defining her privilege to determine the child's religious affiliation. She again seeks an order that the legal custodians "shall not in any way, teach, indoctrinate, or actively expose T.K. to any religion, Catholic or otherwise." Mother argues that the legal custodians should not be permitted to "dictate or control [T.K.'s] connection, thoughts and feelings in all matters pertaining to religion or religious belief in regards to the supernatural or supreme beings." Absent such an order, Mother maintains that the legal custodians could, theoretically, indoctrinate the child in a religion that does not observe formal membership, such as Buddhism, or even subject T.K. to the sacrifice, cooking, and eating of animals pursuant to an obscure religion. *See Torcaso v. Watkins*, 367 U.S. 488, 495, n. 11 (1961); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 525 (1993).

{¶20} Before addressing the legal question before this Court, we make some observations regarding the factual background of this case. Both parents agreed to the award of legal custody to the grandparents. Mother withdrew her own motion for legal custody, and neither she nor Father offered the name of any other potential legal custodian or options for the care of T.K to the trial court. Furthermore, the parents made their decision based upon a great deal of personal knowledge. Mother was apparently raised in the home. The parents' first child lived with these relatives for three years, and T.K. resided with them for nearly a year at the time of the legal custody determination. In having the grandparents as legal custodians of their child, the parents benefitted from a liberal visitation and support policy. The parents did not feel a need to seek a court-order for visitation because, as they explained, they had been able to satisfactorily arrange visits at their convenience for the last several years. In addition, CSB and the trial court had been accommodating regarding the parent's support requirement, preferring,

where possible, that the parents expend their limited funds on financing visits with their child. Finally, we note that the parents have not challenged the award of legal custody to the grandparents on appeal. While the grandparents have no right to serve as legal custodians, it is natural in our society to consider placement with such close relatives and extended family. *See Moore v. City of East Cleveland*, 431 U.S. 494, 503-505 (1977). Mother's choice of legal custodians, therefore, seems to be not only informed, but reasonable and well within the best interests of the child.

{¶21} Turning to the legal question before us, this Court must consider the meaning of "the determination of religious affiliation" in the context of a legal custody case. Here, the parents objected to the legal custodians raising the child in the Catholic faith and have expressed their privilege to determine their child's religious affiliation by choosing no religious affiliation. Accordingly, the trial court ordered the legal custodians to not engage the child in church activities designed for membership, including requirements necessary for membership in Catholic Church. We must decide whether the trial court erred in failing to also bar the legal custodians from permitting the child to experience any teaching, indoctrination, exposure, thoughts, or feelings regarding religion, the supernatural, or supreme beings. Mother has cited no legal authority in support of this expansive interpretation of the statutory language.

{¶22} We have previously explained that the juvenile court's authority in abuse, dependency, and neglect cases is strictly governed by a comprehensive statutory scheme set forth in Chapter 2151 of the Ohio Revised Code. *See e.g., In re A.P.,* 9th Dist. No. 12CA0022-M, 2012-Ohio-3873, ¶ 16; *see also* R.C. 2151.07. Juvenile courts are courts of limited jurisdiction and their powers are created by statute. *See, e.g,. In re J.D.,* 172 Ohio App.3d 288, 2007-Ohio-

3279, ¶ 8, citing *Carnes v. Kemp,* 104 Ohio St.3d 629, 2004-Ohio-7107, ¶ 25 (Stratton, J. dissenting); *see also* R.C. 2151.23.

{¶23} The Ohio General Assembly has provided that when a child is placed in the legal custody of another, the natural parents retain "the privilege to determine the child's religious affiliation." R.C. 2151.353(A)(3)(c); R.C. 2151.011(B)(48). The legislature has reserved no further rights, privileges or responsibilities for the parents in regard to religion. Chapter 2151 of the Revised Code does not offer a definition of "religious affiliation." The statute is narrowly written and does not, by its terms, invite an expansive interpretation.

{¶24} "[W]hen words are not defined in a statute they are to be given their common and ordinary meaning absent a contrary legislative intent." *Moore Personnel Serv., Inc. v. Zaino,* 98 Ohio St.3d 337, 2003-Ohio-1089, ¶ 15. *See also* R.C. 1.42. The common and ordinary meaning of "affiliate" is "to attach as a member or branch," to "bring or receive into close connection," and "to join as a member." Webster's Third New Internatl. Dictionary 35 (1993). The word "determine" is also significant to the exercise of the privilege. The common and ordinary meaning of the word "determine" is "to fix conclusively or authoritatively" and "to settle or decide by choice of alternatives or possibilities." Webster's Third New Internatl. Dictionary 616 (1993). Therefore, in accordance with the common and ordinary meaning of the relevant words in the legislation, Mother retains the privilege to decide or choose a close connection to or membership in a religion for her child or the lack thereof. In selecting "none," Mother has determined a religious affiliation for her child. *See Everson v. Board of Education of Ewing*, 330 U.S. 1, 15-16 (1947) (finding that the establishment clause protects religious belief as well as

disbelief).[2]  The privilege does not allow a parent to attempt to control the child's every exposure to anything remotely religious or spiritual.  Indeed, such an order would not likely be enforceable or within the powers of any court.

{¶25}  Nothing in the statute or the common meaning of the relevant terms supports the expansive interpretation suggested by Mother.  Mother has cited no controlling legal authority in support of her position, and we are not persuaded by her arguments to apply the requested expansive interpretation to a narrowly written statute.  Mother has failed to demonstrate any error suggesting that the trial court either violated the statute or abused its discretion.

{¶26}  Moreover, Mother's statement to the trial court that she "is opposed to *not just the religious affiliation*, such as a baptism, but also any religious upbringing or indoctrination or teaching of that faith" reflects an acknowledgement of the common meaning of the statutory language and a realization that she is asking for more than the statute provides.  (Emphasis added.)  Furthermore, this Court will not presume that the legislature intended, by permitting the parents to determine the child's religious affiliation, to limit the free exercise of religion by the legal custodians.  In exercising her residual parental privilege to determine the religious affiliation of her child, Mother may not control the child's every exposure to religion beyond this common understanding of the phrase.

{¶27}  There is no reason to disturb the trial court judgment at this point.  Mother agreed to the placement of her child in the legal custody of the grandparents, a home with which she was very familiar.  The trial court has held that the parents are privileged, under R.C. 2151.353(A)(3)(c), to determine the child's religious affiliation to be "none" and ordered that the

---

[2] CSB argues, in its responsive brief, that the privilege to determine a religious affiliation does not allow for a determination that the child shall have no affiliation, but CSB has not assigned this as error.

legal custodians are, accordingly, to refrain from engaging the child in church activities designed for membership. The statute offers the parents no further rights, privileges or responsibilities.

{¶28} Mother's second assignment of error is overruled.

### III.

{¶29} Mother's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

BELFANCE, P. J.
HENSAL, J.
CONCUR.


APPEARANCES:

NEIL P. AGARWAL, Attorney at Law, for Appellant.

ROBERT BENEDICT, Attorney at Law, for Appellee.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.

TONY PAXTON, Guardian Ad Litem.